# 1st DIVISION

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## STATE OF ARKANSAS

GARY GLOVER, CLIFTON AND DOROTHY §
GILREATH, JOHN AND MYRTLE §
GOTTSPONER, CLEMENS GOTTSPONER, §
THOMAS AND KARRIE GRAY, THOMAS §
AND GENEVA GRAY, JOSEPH GRESHAM, §
KELLY AND WENDY GROSS, ROBERT §
HALL, JAMES HARRISON, JOHN HART, §
LINDA HAUG, DOROTHY HAWKINS, MIKE §
AND DIANE HENSLEY, THE HILL FAMILY §
REVOCABLE TRUST, HILL TOP R.V. LLC, §
JOE HIPP, KEVIN HOLLAND, BRENDA §
HOLLEY, DONNIE AND SHERRY §
HONEYCUTT, TIM HONEYCUTT, TIMOTHY §
HONEYCUTT, HRW INVESTMENT, INC., §
LIBBY HUTCHINS, HUBERT AND JOYCE §
ISOM, ROY LEON JACKSON, SHERMAN §
JACKSON, RICK AND JUDY JACOBS, §
DIANNA JEFFERSON, FLOYD AND SHERRY §
JERRELL, JIMMY AND BARBARA §
THORNBERRY REVOCABLE TRUST, §
JOHNSON FAMILY MINERALS, LLC, §
KATHY JOHNSTON, CRAIG JONES, MAE §
JONES, BRENDA SUE KAY, JERRY AND §
 LINDA KIRKPATRICK, BENNIE AND §
JUNIOR LATIMER, LD PARISH §
INVESTMENTS, LLC, DOYLE AND EULA §
LEDBETTER, ROBERT LEE, MAE ELLA §
LEWIS, WANDA LIDDELL, MEGAN §
LOCKARD, DANA LOVE, RAYMOND §
AND BETTY LUYET, ALAN MAHAN, DAVID §
MAHAN, GARY AND BARBARA MAHAN, §
PAUL MAHAN, RICHARD MAHAN, WILLIE §
FAY THOMASON MAHAN, GARY §
MAXWELL, WILLIAM PAUL MAXWELL, §
JAMES AND SUSAN MCBRIDE, KENNETH §
AND BETTY MCCOY, LULA MCCOY, §
CHARLENE MEADERS, STEVE MEADERS, §
GAIL MOORE, LINDA MOORE, SHIRLEY §
MOTE, JAMES NABORS, LINDA NABORS, §
SUE NABORS, NAOMIA THOMAS, §
TRUSTEE FOR THE NAPOLEON CRISWELL §
SR. AND BIRTHA CRISWELL FAMILY §
TRUST, JOSEPH AND JANICE NEIL, AND §

CASE NO. 23CV-15934

FILED
2015 SEP 23 PM 4:22
RHONDA WHARTON
BY (signature)
DC

23CV-15-934     231-23100009950-024
GARY GLOVER ET AL V SWN PRO 48 Pages
FAULKNER CO     09/23/2015 04:22 PM
CIRCUIT COURT     CC05

| | |
|---|---|
| **CHARLES AND FERN CORBITT** | § |
| | § |
| *Plaintiffs,* | § |
| | § |
| | § |
| **v.** | § |
| | § |
| **SWN PRODUCTION (ARKANSAS),** | § |
| **LLC f/k/a SEECO, INC., DESOTO** | § |
| **GATHERING COMPANY, LLC,** | § |
| **SWN ENERGY SERVICES** | § |
| **COMPANY, LLC, AND** | § |
| **SOUTHWESTERN ENERGY** | § |
| **COMPANY,** | § |
| | § |
| *Defendants.* | § |
| | § |

## COMPLAINT

Plaintiffs as described below in paragraphs 1 through 69 (collectively, "Plaintiffs") hereby file their complaint against Defendants SWN Production (Arkansas), LLC, DeSoto Gathering Company, LLC, SWN Energy Services Company, LLC and Southwestern Energy Company, and for their Complaint, state and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Gary Glover is an adult resident citizen of Faulkner County, Arkansas, residing at 7 Kessinger Cv., Greenbrier, Arkansas 72058.

2.     Plaintiffs Clifton and Dorothy Gilreath are adult resident citizens of Conway County, Arkansas, residing at 208 Sweet Home Rd., Center Ridge, Arkansas 72027.

3.     Plaintiffs John and Myrtle Gottsponer are adult resident citizens of Conway County, Arkansas, residing at 301 Lone Grove Rd., Solgohachia, Arkansas 72156.

4.     Plaintiff Clemens Gottsponer is an adult resident citizen of Pulaski County, Arkansas, residing at 108 Diamond Pointe Dr., Maumelle, Arkansas 72113.

**5.** Plaintiffs Thomas and Karrie Gray are adult resident citizens of Conway County, Arkansas, residing at 3772 9 Hwy, Solgohachia, Arkansas 72156.

**6.** Plaintiffs Thomas and Geneva Gray are adult resident citizens of Conway County, Arkansas and reside at 83 Bethlehem Rd., Springfield, Arkansas 72157.

**7.** Plaintiff Joseph Gresham is an adult resident citizen of Van Buren County, Arkansas, residing at 2454 Highway 92 E., Bee Branch, Arkansas 72013.

**8.** Plaintiffs Kelly and Wendy Gross are adult resident citizens of Van Buren County, Arkansas, residing at 295 Mt. Zion Rd., Bee Branch, Arkansas 72013.

**9.** Plaintiff Robert Hall is an adult resident citizen of Pulaski County Arkansas, residing at 249 Jackson Dr., Quitman, Arkansas 72131.

**10.** Plaintiff James Harrison is an adult resident citizen of Van Buren County, Arkansas, residing at 2624 Dayton Rd. Scotland, Arkansas 72141.

**11.** Plaintiff John Hart is an adult resident citizen of Conway County, Arkansas, residing at 5222 Hwy 9, Center Ridge, Arkansas 72027.

**12.** Plaintiff Linda Haug is an adult resident citizen of Garland County, Arkansas, residing at 8 Jardin Terrace, Hot Springs Village, Arkansas 71909.

**13.** Plaintiff Dorothy Hawkins is an adult resident citizen of Conway County, Arkansas, residing at 3734 Hwy 92, Center Ridge, Arkansas 72027.

**14.** Plaintiffs Mike and Diane Hensley are adult resident citizens of Cleburne County, Arkansas, residing at 399 Utica Rd., Heber Springs, Arkansas 72543.

**15.** Plaintiff Wanda Hill, Trustee for the Hill Family Revocable Trust, is an adult resident citizen of Conway County, Arkansas, residing at 129 Bostian Lane, Morrilton, Arkansas 72110.



16.     Plaintiff Hill Top R.V. LLC, is an Arkansas limited liability company with its principle place of business at 2795 Edgemont Rd., Hwy 16 W., Quitman, Arkansas 72131, which is located in Pulaski County, Arkansas.

17.     Plaintiff Joe Hipp is an adult resident citizen of Pulaski County, Arkansas, residing at 2070 Rosebud Rd., Quitman, Arkansas 72131.

18.     Plaintiff Kevin Holland is an adult resident citizen of Van Buren County, Arkansas, residing at 1804 Black Hill Rd., Bee Branch, Arkansas 72013.

19.     Plaintiff Brenda Holley is an adult resident citizen of Pulaski County, Arkansas, residing at 352 Acorn Dr., Quitman, Arkansas 72131.

20.     Plaintiffs Donnie and Sherry Honeycutt are an adult resident citizens of Faulkner County, Arkansas, residing at 1835 Calhoun Dr., Conway, Arkansas 72034.

21.     Plaintiff Tim Honeycutt is an adult resident citizen of Conway County, Arkansas, residing at 921 Deer Run Rd., Center Ridge, Arkansas 72027.

22.     Plaintiff Timothy Honeycutt is an adult resident citizen of Van Buren County, Arkansas, residing at 824 Austin Rd., Clinton, Arkansas 72031.

23.     Plaintiff HRW Investment, Inc., is an Arkansas incorporated company with its principle place of business at 3018 Timbercreek Dr., Bryant, Arkansas 72022, which is located in Saline County, Arkansas.

24.     Plaintiff Libby Hutchins is an adult resident citizen of Faulkner County, Arkansas, residing at 656 Sulphur Rd., Damascus, Arkansas 72039.

25.     Plaintiffs Hubert and Joyce Isom are adult resident citizens of Van Buren County, Arkansas, residing at 3497 Hwy 95 E., Clinton, Arkansas 72031.

26.     Plaintiff Roy Leon Jackson is an adult resident citizen of Pulaski County, Arkansas, residing at 1690 Millerpoint Rd. N., Quitman, Arkansas 72131.

27.     Plaintiff Sherman Jackson is an adult resident citizen of Pulaski County, Arkansas, residing at 2000 Millerpoint Rd. N., Quitman, Arkansas 72131.

28.     Plaintiffs Rick and Judy Jacobs are adult resident citizens of Pulaski County, Arkansas, residing at 7 Ledge Rock Court, Little Rock, Arkansas 72211.

29.     Plaintiff Dianna Jefferson is an adult resident citizens of St. Francis County, Arkansas, 302 Trenton Rd., Forrest City, Arkansas 72335.

30.     Plaintiffs Floyd and Sherry Jerrell are adult resident citizens of Van Buren County, Arkansas, residing at 1730 E. Mountain Rd., Bee Branch, Arkansas 72013.

31.     Plaintiff Barbara Throneberry as Trustee for the Jimmy and Barbara Thornberry Revocable Trust, is resident citizen of Faulkner County, Arkansas, residing at 3195 Windsong Lane, Conway, Arkansas 72034.

32.     Plaintiff Johnson Family Minerals, LLC is an Arkansas limited liability company with its principle place of business at 7 Sedgefield Dr., Conway, Arkansas 72034, which is located in Faulkner County, Arkansas.

33.     Plaintiff Kathy Johnston is an adult resident citizen of Conway County, Arkansas, residing at 6880 Hwy 9, Center Ridge, Arkansas 72027.

34.     Plaintiff Craig Jones is an adult resident citizen of Conway County, Arkansas, residing at 4822 Hwy 124, Center Ridge, Arkansas 72027.

35.     Plaintiff Mae Jones is an adult resident citizen of Conway County, Arkansas, residing at 46 Tower Rd., Hattieville, Arkansas 72063.

**36.**     Plaintiff Brenda Sue Kay is an adult resident citizen of Van Buren County, Arkansas, residing at 671 Deer Run Rd., Bee Branch, Arkansas 72013.

**37.**     Plaintiffs Jerry and Linda Kirkpatrick are adult resident citizens of Conway County, Arkansas, residing at 6907 Hwy 9, Center Ridge, Arkansas 72027.

**38.**     Plaintiffs Bennie and Junior Latimer are adult resident citizens of Conway County, Arkansas, residing at 2212 Hwy 9, Morrilton, Arkansas 72110.

**39.**     Plaintiff LD Parish Investments, LLC is an Arkansas limited liability company with its principle place of business at 627 Cherokee Circle, Orlando, FL 32801.

**40.**     Plaintiffs Doyle and Eula Ledbetter are adult resident citizens of Conway County, Arkansas, residing at 4169 Hwy 9, Springfield, Arkansas 72157.

**41.**     Plaintiff Robert Lee is an adult resident citizen of Van Buren County, Arkansas, residing at 11184 Hwy 336 West, Clinton, Arkansas 72031.

**42.**     Plaintiff Mae Ella Lewis is an adult resident citizen of Texas, residing at 8201 Elle Cir., Apt. 1704, Fort Worth, TX 76120.

**43.**     Plaintiff Wanda Liddell is an adult resident citizen of Faulkner County, Arkansas, residing at 23 West Hills Rd., Greenbrier, Arkansas 72058.

**44.**     Plaintiff Megan Lockard is an adult resident citizen of Conway County, Arkansas, residing at 6909 Hwy 9, Center Ridge, Arkansas 72027.

**45.**     Plaintiff Dana Love is an adult resident citizen of Conway County, Arkansas, residing in Solgohachia, Arkansas 72156.

**46.**     Plaintiffs Raymond and Betty Luyet are adult resident citizens of Faulkner County, Arkansas, residing at 3325 Highway 25 N., Clinton, Arkansas 72032.

**47.**     Plaintiff Alan Mahan is an adult resident citizen of Van Buren County, Arkansas, residing at 643 Rabbit Ridge Rd., Bee Branch, Arkansas 72013.

**48.**     Plaintiff David Mahan is an adult resident citizen of Van Buren County, Arkansas, residing at 3974 Hwy 285, Bee Branch, Arkansas 72013.

**49.**     Plaintiffs Gary and Barbara Mahan are adult resident citizens of Missouri, residing at 8332 Shinnecock Rd., Nixa, MO 65714.

**50.**     Plaintiff Paul Mahan is an adult resident citizen of Faulkner County, Arkansas, residing at 34 Pinnacle Dr., Rogers, Arkansas 72758.

**51.**     Plaintiff Richard Mahan is an adult resident citizen of Faulkner County, Arkansas, residing at 709 Hwy 285, Damascus, Arkansas 72039.

**52.**     Plaintiff Willie Fay Thomason Mahan is an adult resident citizen of Conway County, Arkansas, residing at 24 Lakeview Rd., Morrilton, Arkansas 72110.

**53.**     Plaintiff Gary Maxwell is an adult resident citizen of Conway County, Arkansas, residing in Center Ridge, Arkansas 72027.

**54.**     Plaintiff William Paul Maxwell is an adult resident citizen of Conway County, Arkansas, residing in Center Ridge, Arkansas 72027.

**55.**     Plaintiffs James and Susan McBride are an adult resident citizens of Faulkner County, Arkansas, residing at 45 Cherokee Rd., Damascus, AR 72039.

**56.**     Plaintiffs Kenneth and Betty McCoy are adult resident citizens of Conway County, Arkansas, residing at 3646 Hwy 9, Solgohachia, Arkansas 72156.

**57.**     Plaintiff Lula McCoy is an adult resident citizen of Conway County, Arkansas, residing at 251 Bald Knob Rd., Plumerville, Arkansas 72127.

58.     Plaintiff Charlene Meaders is an adult resident citizen of Conway County, Arkansas, residing at 355 M&M Rd., Center Ridge, Arkansas 72027.

59.     Plaintiff Steve Meaders is an adult resident citizen of Conway County, Arkansas, residing at 367 M&M Rd., Center Ridge, Arkansas 72027.

60.     Plaintiff Gail Moore are adult resident citizens of Cleburne County, Arkansas, residing at 522 Spruce St., Heber Springs, Arkansas 72543.

61.     Plaintiff Linda Moore is an adult resident citizen of Pulaski County, Arkansas, residing at 5675 Heber Springs Rd., Quitman, Arkansas 72131.

62.     Plaintiff Shirley Mote is an adult resident citizen of Van Buren County, Arkansas, residing at 44 James Rd., Quitman, Arkansas 72013.

63.     Plaintiff James Nabors adult resident citizen of Washington County, Arkansas, residing at 300 Industrial Drive, Springdale, Arkansas 72762.

64.     Plaintiff Linda Nabors is an adult resident citizen of Faulkner County, Arkansas, residing at 3480 Cutter Ridge Rd. Conway, Arkansas 72034.

65.     Plaintiff Sue Nabors adult resident citizen of Van Buren County, Arkansas, residing at 739 Rabbit Ridge, Bee Branch, Arkansas 72013.

66.     Plaintiff Naomia Thomas, Trustee for the Napoleon Criswell Sr. and Birtha Criswell Family Trust, is an adult resident citizen of Harris County, Arkansas, residing at 6903 Yorkwood Dr., Little Rock, Arkansas 72209.

67.     Plaintiffs Joseph and Janice Neil are adult resident citizens of Conway County, Arkansas, residing at 6945 Hwy 9, Center Ridge, Arkansas 72027.

68.     Plaintiffs Jim and Darlene Carson are adult resident citizens of Cleburne County, Arkansas, residing at 125 Bluff View Dr., Quitman, Arkansas 72131.

**69.** Plaintiffs Charles and Fern Corbitt are adult resident citizens of Faulkner County, Arkansas, residing at 4 Art Pond Rd., Conway, Arkansas 72013.

**70.** Defendant SWN Production (Arkansas), LLC f/k/a SEECO, Inc. ("SEECO") is a Texas limited liability company with its principal place of business in Texas. SEECO is doing substantial business in the State of Arkansas and may be served with process through its registered agent, The Corporation Company, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201. Personal jurisdiction comports with Arkansas' long-arm statute and due process under the Constitution of the United States.

**71.** Defendant DeSoto Gathering Company, LLC ("DeSoto") is a Texas limited liability company with its principal place of business in Texas. DeSoto is doing substantial business in the State of Arkansas and may be served with process through its registered service agent, The Corporation Company, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201. Personal jurisdiction comports with Arkansas' long-arm statute and due process under the Constitution of the United States.

**72.** Defendant SWN Energy Services Company, LLC ("SES") is a Texas limited liability company with its principal place of business in Texas. SES is doing substantial business in the State of Arkansas and may be served with process through its registered service agent, The Corporation Company, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201. Personal jurisdiction comports with Arkansas' long-arm statute and due process under the Constitution of the United States.

**73.** Defendant Southwestern Energy Company ("SWN Energy") is a Texas corporation with its principal place of business in Texas. SWN Energy is doing substantial business in the State of Arkansas and may be served with process through its registered service

agent, The Corporation Company, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201. Personal jurisdiction comports with Arkansas' long-arm statute and due process under the Constitution of the United States. Defendant Southwestern Energy has offices in Faulkner County Arkansas at 1000 SWN Drive, Conway, AR 72032.

74.    Plaintiffs are royalty owners of oil, gas, and mineral interests in lands and wells located in and around Faulkner, Conway and Van Buren Counties in Arkansas.

75.    Plaintiffs' oil, gas, and mineral interests in their lands are subject to various oil and gas leases and/or state regulatory orders pursuant to which wells were drilled and completed on Plaintiffs' lands, including in the Fayetteville Shale (the "Wells"). Plaintiffs' oil and gas leases on which they own royalty interests and on which the Wells are located are attached hereto as Exhibit I.

76.    SEECO owns working interests in Plaintiffs' lands and acts as the operator of the Wells. SEECO has paid royalties to Plaintiffs from SEECO's sales of the production of natural gas from the Wells.

77.    This Court has jurisdiction over Defendant in that its wrongful acts occurred and caused damages to Plaintiffs in Arkansas and all of the natural gas on which the royalties are due was produced in Arkansas.

78.    For numerous Plaintiffs the amount in controversy is less than the sum of $75,000.

79.    Venue is proper in Faulker County, Arkansas. The lands and wells covered by the allegations in the Complaint are exclusively located in the State of Arkansas. Plaintiffs are citizens of the State of Arkansas, they reside in various Counties located in and around Faulkner County, Arkansas, and their lands are located in various Counties in around Faulkner County,

85.     Upon information and belief, SEECO, DeSoto, and SES are all wholly-owned subsidiaries of SWN Energy.  SWN Energy is the parent company of SEECO, DeSoto, and SES, and profits from the acts of its subsidiaries alleged herein.

86.     DeSoto and SES are involved in the gathering, treatment, compression, transportation, and sale of the gas which is produced by SEECO.

87.     During the times at issue herein, SEECO acted as the operator or the non-operating working interest owner of Plaintiffs' Wells.  Specifically, SEECO finds and brings natural gas to the surface through exploration and production activities in Arkansas under the Leases.

88.     Natural gas produced by an operator such as SEECO can be moved from wells to the market through a series of pipeline, including gathering lines or systems.  From a well, gas goes into a gathering line that converges with gathering lines from other wells.  These gathering lines are part of a gathering system and are typically like branches on a tree, getting larger as they get closer to a central collection point, processing facilities and/or an interconnection with a larger intrastate or interstate transmission pipeline.  DeSoto is the owner and/or operator of the gathering system utilized by SEECO.

89.     A gathering system may need one or more compressors, which may use to move the gas through the gathering lines and through the gathering system.  Some gathering systems include processing or treating facilities, which perform functions such as removing impurities like carbon dioxide or sulfur, so that the gas meets interstate pipeline specifications.

90.     From a gathering system, gas is typically moved into an intra- or interstate transmission system consisting of large diameter pipes which typically transport gas from producing regions to local distribution companies across the United States.

## II. SEECO'S ARTIFICIAL INFLATION OF DEDUCTIONS CHARGED TO PLAINTIFFS.

91. In an effort to maximize their profits, SEECO, DeSoto, SES, and SWN Energy executed a fraudulent scheme, design, plan, and pattern of unlawful activity designed to deprive Plaintiffs of the full royalties which they are entitled to receive. These fraudulent actions were done, in part, by non-arm's length contracts orchestrated by SEECO, DeSoto, SES, and SWN Energy.

92. In addition to its exploration, development, and production activities conducted through SEECO, SWN Energy is also focused on creating and capturing additional value through its natural gas gathering and marketing business, to which it refers as "midstream services." SWN Energy engages in natural gas gathering activities through its wholly-owned subsidiary DeSoto. DeSoto primarily supports SWN Energy's exploration, development, and production activities and generates revenue from fees associated with the gathering of natural gas.

93. DeSoto owns and/or operates a gathering system in the Fayetteville Shale through which DeSoto gathers and compresses the gas to move the gas from the wellhead to the interstate pipeline. All of Plaintiffs' Wells are connected to the gathering system owned and operated by DeSoto.

94. The gas from each Well SEECO operates is gathered, compressed, and moved to the interstate pipeline under a single contract dated in 2006 between SEECO and DeSoto (the "Gathering Agreement"). In Plaintiffs' Wells where SEECO is a non-operating working interest owner, SEECO takes its (and Plaintiffs') gas in-kind and DeSoto gathers, compresses, and moves such gas to the interstate pipeline under the same Gathering Agreement.

95.     SWN Energy's wholly-owned marketing subsidiary, SES, captures downstream opportunities that arise through the marketing and transportation of the gas produced from Plaintiffs' Wells.

96.     All of SEECO's gas produced from Plaintiffs' Wells, whether operated by SEECO or not, is sold to SES under a single contract also dated in 2006 between SEECO and SES (the "Sales Contract").  SES, in turn, sells all the gas to third parties on one of the interstate pipeline and remits the proceeds to SEECO based on a weighted average sales price ("WASP") calculated by SES.

97.     The Gathering Agreement and the Sales Contract evidence an agreement between SEECO, DeSoto, SES, and SWN Energy to create a system in which they fraudulently sell their services to each other, setting up a system of self-dealing to ultimately benefit SEECO, DeSoto, SES, and SWN Energy by minimizing royalty payments to Plaintiffs.  They have engaged in this unlawful conduct to improperly pay millions of dollars in royalties owed to Plaintiffs be deducting inflated, unreasonable, and/or fictitious (e.g., not incurred) costs from amounts owed to Plaintiffs.

**A. The Gathering Fee**

98.     Pursuant to the Gathering Agreement, SEECO agreed to pay DeSoto a "postage-stamp rate" gathering fee on a $/Mcf [1] basis ("Gathering Fee"). The Gathering Fee is charged to SEECO on all Plaintiffs' Wells connected to DeSoto's system.

99.     The Gathering Fee is not "cost-of-service" based, but is instead marked up to provide additional revenue and a profit and/or return on invested capital to DeSoto, and ultimately SWN Energy.  SEECO paid Gathering Fees to DeSoto that greatly exceeded DeSoto's

---

[1] The term "Mcf" is an abbreviation denoting a thousand cubic feet of natural gas.

actual costs.  SEECO has, in turn, passed their inflated fees along to Plaintiffs by deducting them from Plaintiffs' royalty payments.  These deductions were inflated, improper, completely unrelated to the actual cost of service, did not enhance the marketability of the gas, and instead merely served to enrich SEECO, DeSoto, SES, and SWN Energy.

### B. The Treatment Fee

**100.**    Under the Gathering Agreement, SEECO also agreed to pay DeSoto a "postage-stamp rate" treatment fee on a $/Mcf basis ("Treatment Fee").  The Treatment Fee is charged to SEECO on wells which produce gas containing a concentration of carbon dioxide above 2%, as measured at or near the wellhead.  SEECO, in turn, passed the Treatment Fee along to Plaintiffs by deducting the Treatment Fee from Plaintiffs' royalty payments.  However, no "treatment" is being performed by DeSoto.

**101.**    Under the Gathering Agreement, "treatment" refers to the process necessary to reduce the concentration of carbon dioxide in the gas stream to below 2% to meet interstate pipeline specifications.  DeSoto has the ability to reduce the concentration of carbon dioxide in one of two ways:  (1) "blending," which is the ordinary process of having a high carbon dioxide content commingling with gas that has a low carbon dioxide content; and (2) "amine treatment," which involves amine units, where gas is run through amine liquids that absorb the carbon dioxide.

**102.**    Blending is not a separate treatment process that would justify the fixed Treatment Fee's deduction from Plaintiffs' royalty payments.  Further, there are no amine units in operation by DeSoto that are used to treat gas produced from Plaintiffs' Wells.  Nonetheless, SEECO charged Plaintiffs a Treatment Fee on any gas produced from their Wells where carbon dioxide concentrations exceed 2%.

**103.**   The Treatment Fee is not "cost-of-service" based, but was instead marked up to provide additional revenue and a profit and/or return on invested capital to DeSoto, and ultimately SWN Energy.   SEECO paid Treatment Fees to DeSoto that greatly exceed DeSoto's actual costs.   SEECO has, in turn, passed these inflated Treatment Fees along to Plaintiffs by deducting them from Plaintiffs' royalty payments.   These deductions were inflated, improper, completely unrelated to the actual cost of service, did not enhance the marketability of the gas, and instead merely served to enrich SEECO, DeSoto, SES, and SWN Energy..

### C. The Compression Charge

**104.**   SEECO also charges Plaintiffs a compression charge for gas that DeSoto Gathering uses an consumes at the fuel compressor engines on DeSoto's gathering system and for gas lost or unaccounted for, collectively called "Fuel and Lost and Unaccounted for Gas" or "FL&U" (the "Compression Charge").

**105.**   After the gross wellhead volume is brought to the surface, DeSoto consumes Plaintiffs' gas off-lease for fuel.   The actual volume of gas delivered to and sold by SES is less than the wellhead volume by the amount of the FL&U volume.   SEECO deducts the Compression Charge from Plaintiffs' royalties by multiplying the FL&U volume by the WASP and deducting such amount from the gross revenues.

**106.**   Additionally, Plaintiffs are being charged the Gathering Fee and the Treatment Fee on the FL&U volume.   Despite the fact that the FL&U volume is not sold and royalties are not paid on that volume, SEECO nonetheless charges Plaintiffs Gathering and Treatment Fees on the FL&U volume as if that gas was sold.

107.    DeSoto's consumption of gas off-lease for fuel and SEECO's failure to pay royalty on gas consumed for fuel while at the same time charging Plaintiffs Gathering and Treatment Fees on the gas consumed for fuel is unjustified and contrary to Plaintiffs' Leases and Arkansas law.

III.    **PLAINTIFFS ARE CHARGED UNREASONABLE, INFLATED, FICTITIOUS, IMPROPER, AND UNLAWFUL ROYALTY DEDUCTIONS.**

108.    In order to facilitate SWN Energy's exploration and production activities in Arkansas, SEECO obtained oil and gas Leases from Plaintiffs.   These Leases consist of a commonly used form that SEECO, or its agents, utilized to lease thousands of acres in Arkansas. Because SEECO entered into similar Leases with each of the Plaintiffs, the number of pages of Leases at issue is voluminous, and SEECO has copies of each Lease at issue and knows the identity of each Plaintiff, and therefore, good cause exists for Plaintiffs to only attach a sample of the Leases at issue, rather than all Plaintiffs' Leases. (Ex. I).

109.    Under the Leases, which are similar with respect to the issues in this case, Plaintiffs own royalty interests in production from their Wells.

110.    The majority of Plaintiffs' Leases provide in pertinent part as follows:

> Lessee shall pay 1/8th of the proceeds derived from the sale of all gas (including substances contained in such gas) produced, saved, and sold by Lessee. Proceeds are defined as the actual amount received by the Lessee for the sale of said gas.  In calculating the proceeds, derived from the sale of gas produced, saved and sold by Lessee, Lessee shall be entitled to deduct all reasonable gathering, transportation, treatment, compression, processing, and marketing costs that are incurred by Lessee in connection with the sale of gas.

111.    Plaintiffs' Leases do not allow for the deduction of costs that are not the actual, reasonable costs incurred by SEECO and also do not allow third parties to use gas for their operations.   Notwithstanding these limitations, SEECO, DeSoto, SES, and SWN Energy

generated additional profits at Plaintiffs' expense by: (1) charging inflated and unreasonable Gathering and Treatment Fees that are not based on cost of service; (2) charging Treatment Fees even though no "treatment" is performed or incurred; (3) consuming gas off-lease for fuel without paying royalty on such gas while at the same time charging Gathering and Treatment Fees on the gas consumed.  SEECO, DeSoto, SES, and SWN Energy's actions described herein were knowing, intentional, in bad faith, and clearly violate the Leases and Arkansas law.

112.    Plaintiffs have had their royalty payments calculated and paid solely according to SEECO's internal accounting procedures, which simply take sales and deduction information uploaded by DeSoto Gathering and SES to the SWN Energy database, without any practice of auditing such number, and allocate volume, revenue, and deduction amounts to each Well's interest owners.

113.    The deductions to Plaintiffs' royalties are based on the incestuous, non-arms-length Gathering Agreement and Sales Contract.

114.    All royalties paid to Plaintiffs are calculated by deriving the proceeds from SES's sales to these affiliated third parties[2] and deducting from that amount the Gathering Fee, the Treatment Fee, if applicable,[3] and a Compression Charge.[4]  The funds wrongfully withheld are specific and readily identifiable pursuant to statements largely in the control of SEECO, DeSoto, SES, and SWN Energy.

---

[2] Gross proceeds are calculated by multiplying wellhead volumes by the WASP.
[3] The common fixed Gathering Fee and, where applicable, the common fixed Treatment Fee are multiplied by the wellhead volumes.
[4] The Compression Charge is equal to the FL&U volumes reported by DeSoto Gathering multiplied by the WASP reported by SES.

115.    SEECO, DeSoto, SES, and SWN Energy know that the method and/or manner in which royalties are being calculated and paid to Plaintiffs is improper and not in accordance with their obligations to Plaintiffs under the Leases and Arkansas law.

116.    SEECO, in concert and agreement with DeSoto, SES, and SWN Energy, has also actively, intentionally, and fraudulently concealed from Plaintiffs the conduct and actions alleged herein.  Each month, SEECO reports royalty payments to Plaintiffs on check stubs that were identical as to form. (E.g., Ex. II).  These check stubs are misleading and fraudulent by both omission and commission, including without limitation:

    a.  SEECO's check stubs effectively stated "this is what is owed" to Plaintiffs;

    b.  SEECO failed to provide on the check stub all information necessary for Plaintiffs to recreate SEECO's calculations;

    c.  SEECO failed to fully and properly disclose all information upon which deductions are taken and Plaintiffs' royalties are calculated;

    d.  SEECO concealed sales and FL&U volumes and the fact that SEECO was assessing charges to Plaintiffs for gas that was never sold;

    e.  SEECO concealed its overcharging of Plaintiffs' royalties be calculating the Gathering and Treatment Fees based on wellhead volumes even though a portion of the wellhead volumes were never delivered or sold but instead consumed or lost;

    f.  SEECO failed to disclose that the deductions were related to affiliated purchases and non-arms-length transactions; and

    g.  SEECO concealed charges that were inflated, unreasonable, and/or not incurred, including charges for return on investment and profit.

**117.**    The fraudulent scheme described above began in approximately January 2006 and continues through today.  SEECO, DeSoto, SES, and SWN Energy have actively participated in, and profited from, this fraudulent scheme by skimming revenues from Plaintiffs, as set forth above.  SEECO, in concert and agreement with DeSoto, SES, and SWN Energy, has failed to disclose, and has actively and fraudulently concealed, all of the above-mentioned actions from Plaintiffs.

**118.**    SEECO, DeSoto, SES, and SWN Energy have masked the production and accounting functions in secrecy, thereby depriving Plaintiffs of critical information.  SEECO uses confidential internal royalty payment systems.  SEECO, DeSoto, SES, and SWN Energy are in exclusive possession, custody, and control of all information concerning the calculation and payment of Plaintiffs' royalties.  Plaintiffs do not have access to this information and are compelled to rely on SEECO to accurately, fairly, and honestly pay Plaintiffs their royalties.

**119.**    Plaintiffs did not become aware, and could not have become aware through the exercise of reasonable diligence, that the schemes described herein were in existence and thus Plaintiffs are entitled to rely on the doctrines of fraudulent concealment, discovery rule, continuing conduct and estoppel, or other tolling doctrines, whether contractual, statutory, or common law.

**120.**    Plaintiffs have performed all obligations under their Leases and have satisfied all conditions precedent to bringing this action.

**COUNT I – BREACH OF CONTRACT**
**(Against SEECO)**

**121.**    Plaintiffs incorporate by reference paragraphs 1 through 120 as if fully set forth herein.

20

**122.**     Plaintiffs have a direct contractual relationship with SEECO by virtue of their Oil and Gas Leases.

**123.**     Plaintiffs' Leases also include implied covenants requiring SEECO to place the gas produced from Plaintiffs' Wells into marketable condition.

**124.**     SEECO has failed to properly report, account for, and pay to Plaintiffs all royalties that are due and owing under the Leases by, among other things, deducting from Plaintiffs' royalty payments costs for gathering, compression, and treatment that were inflated, unreasonable, and/or not incurred.   Additionally, SEECO failed to pay royalty on all gas produced from Plaintiffs' Wells based on the total value of the proceeds received from arms-length sales of the natural gas.

**125.**     SEECO has failed to pay Plaintiffs all of the royalties that are due and owing to them.   SEECO's failure to pay such royalties constitutes a breach of express lease provisions, including the royalty clause, and a breach of SEECO's implied obligations to Plaintiffs, including the implied duty to market the gas and implied covenant of good faith and fair dealing.

**126.**     In addition, SEECO's failure to pay royalties due and owing on the total value of the proceeds received from arms-length sales of the gas constitutes a violation of Arkansas law, including A.C.A. §§ 15-74-601 through 604 and A.C.A. § 15-74-708.

**127.**     Upon information and belief, SEECO uses other methods, yet to be discovered, to reduce royalty payments to Plaintiffs.

**128.**     Plaintiffs have been damaged as a direct result of SEECO's breaches.

### COUNT II – BREACH OF THE STATUTORY DUTY OF THE GOOD FAITH PRUDENT OPERATOR STANDARD (A.C.A. § 15-73-207)
### (Against SEECO)

**129.**   Plaintiffs incorporate by reference paragraphs 1 through 128 as if fully set forth herein.

**130.**   SEECO has a statutory duty to Plaintiffs to perform the covenants of Plaintiffs' Leases in good faith, to develop and operate the Wells on Plaintiffs' Leases as a prudent operator for the mutual benefit of Plaintiffs and SEECO pursuant to A.C.A. § 15-73-207.

**131.**   Upon information and belief, the acts and omissions referred to herein constitute SEECO's breach of the statutory duty of the good faith prudent operator standard, and Plaintiffs have suffered damages as a direct result of such violations.

<u>**COUNT III – FRAUD AND FRAUDULENT CONCEALMENT**</u>
**(Against SEECO)**

**132.**   Plaintiffs incorporate by reference paragraphs 1 through 131 as if fully set forth herein.

**133.**   SEECO secretly and knowingly underpaid royalties to Plaintiffs without their knowledge.

**134.**   SEECO sent Plaintiffs false and misleading statements on monthly check stubs with the intent to have Plaintiffs rely on those false statements.  SEECO falsely represented the material facts by, among other things, falsely representing the circumstances of its sales of gas and the deduction of costs and fees, as specifically set out in the foregoing allegations.  In essence, SEECO's check stubs represented that "this is the amount we owe you" when, in fact, the amount was deficient.  SEECO among other things, made many improper deductions to arrive at the net royalty payment, and therefore each check was less than SEECO actually owed each Plaintiff royalty owner under Plaintiffs' Leases and Arkansas law.

**135.**   While the check stubs reflect vague and confusing references to deductions, the deductions taken were inflated, unreasonable, and/or fictitious (e.g., not incurred).  For example,

SEECO made deductions from Plaintiffs' royalties for treatment when, in reality, no such costs could have been incurred because there are no anime united in operation by DeSoto to treat gas produced from Plaintiffs' Wells.

136. SEECO, DeSoto, SES, and SWN Energy are in exclusive possession, custody, and control of all information concerning the calculation and payment of Plaintiffs' royalties. Plaintiffs do not have access to this information and are compelled to rely on SEECO to accurately, fairly, and honestly pay Plaintiffs the royalties that are due and owing to them. SEECO failed to provide material facts on Plaintiffs' check stubs by, among other things, failing to provide all necessary information for Plaintiffs to reconstruct SEECO's calculations, failing to fully and properly disclose all information upon which deductions are taken and Plaintiffs' royalties are calculated, and failing to disclose that the deductions were related to non-arms-length, affiliate transactions.

137. SEECO is under a duty to honestly and accurately account to Plaintiffs and to fully report to them with respect to the production, sale, and marketing of gas produced from Plaintiffs' Wells. SEECO has breached this duty, as specifically set out in the foregoing allegation, and by doing so has gained an advantage to Plaintiffs by misleading them to their detriment.

138. Because of SEECO's misrepresentations, omissions, and general scheme to conceal its underpayments, Plaintiffs did not become aware, and could not have become aware through the exercise of reasonable diligence, that such schemes were in existence. Plaintiffs justifiably relied on these false representations and omissions by accepting SEECO's royalty payments and, as a result, Plaintiffs have sustained damages. SEECO knew that Plaintiffs would rely on these false statements and omissions.

139. Plaintiffs are entitled to recover compensatory and punitive damages as a result of SEECO's intentional and malicious conduct, and are entitled to tolling of the applicable statutes of limitations, whether contractual, statutory, or common law, based upon the doctrines of fraudulent concealment, discovery rule, continuing conduct, and/or estoppel.

## COUNT IV – VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT (A.C.A. §§ 4-88-101, ET SEQ.)
### (Against SEECO)

140. Plaintiffs incorporate by reference paragraphs 1 through 139 as if fully set forth herein.

141. Plaintiffs affirmatively plead a violation of the Arkansas Deceptive Trade Practices Act ("ADTPA"), more particularly described as A.C.A. § 4-88-101, *et seq.*, and specifically, A.C.A. §§ 4-88-107 and 4-88-108.

142. SEECO knowingly and intentionally withheld relevant information concerning its royalty calculations from Plaintiffs and was involved in "knowingly taking advantage of" Plaintiffs by engaging in the aforementioned fraudulent and deceptive activities in violation of the ADTPA.

143. SEECO, through its actions and inactions, was engaged in an "unconscionable, false, or deceptive act or practice in business, commerce, or trade" in violation of A.C.A. § 4-88-108 by ignoring royalty payment provisions in Plaintiffs' Leases in order to lessen Plaintiffs' portions of any royalty payments.

144. SEECO has engaged in further violations by improperly evaluating the BTU quality of the gas at issue and fraudulently taking and using fuel gas without just compensation.

145. SEECO, through its actions and inactions, was involved in the "concealment, suppression, or omission of material facts with intent that others rely upon that concealment,

suppression, or omission," in violation of A.C.A. § 4-88-108(2). Plaintiffs specifically pray for all damages recoverable under the ADTPA, including reasonable attorneys' fees related to bringing this action, pursuant to A.C.A. § 4-88-113, *et seq.*

146.    SEECO is highly familiar with the laws, standard practices, and nuances of the gas industry, and has been conducting natural gas operations since the days when the processes of hydraulic fracturing and horizontal drilling were first being developed.

147.    Specifically, SEECO, DeSoto, SES, and SWN Energy have developed a system and a process to fraudulently generate enormous profits from their inter-company operations at the expense of Plaintiffs.

148.    SEECO, DeSoto, SES, and SWN Energy have conspired and worked in concert to intentionally defraud Plaintiffs by structuring their gas sales in such a way as to lessen the sales price received thus reducing royalties paid to Plaintiffs, while at the same time, obtaining a higher sales price for themselves, to the detriment of Plaintiffs.

149.    SEECO, DeSoto, SES, and SWN Energy have also conspired and worked in concert to avoid fully paying Plaintiffs for fuel gas which was used in the midstream operations of DeSoto and SES.

150.    Plaintiffs have suffered damages as a direct and proximate result of SEECO, DeSoto, SES, and SWN Energy's conduct.

**COUNT V – CIVIL CONSPIRACY**
**(Against All Defendants)**

151.    Plaintiffs incorporate by reference paragraphs 1 through 150 as if fully set forth herein.

152.   As alleged above, SEECO, DeSoto, SES, and SWN Energy have entered into a civil conspiracy to defraud the plaintiffs, to intentionally exercise dominion and control over property belonging to Plaintiffs, and violate the Arkansas Deceptive Trade Act.

153.   As a direct and proximate result of their civil conspiracy defendants SEECO, DeSoto, SES and SWN Energy should be held to be jointly and severally liable to plaintiffs for all damages flowing from their tortious acts.

## COUNT V – CONVERSION
### (Against All Defendants)

154.   Plaintiffs incorporate by reference paragraphs 1 through 153 as if fully set forth herein.

155.   As alleged above, SEECO, DeSoto, SES, and SWN Energy intentionally exercised dominion and control over property belonging to Plaintiffs, which was inconsistent with SEECO, DeSoto, SES, and SWN Energy's rights to possess such property.

156.   As a direct and proximate result of SEECO, DeSoto, SES and SWN Energy's wrongful conversion, Plaintiffs have suffered and continue to suffer damages.

157.   Accordingly, SEECO, should pay, in addition to actual damages, punitive damages.

## COUNT VI – UNJUST ENRICHMENT
### (Against DeSoto, SES, and SWN Energy)

158.   Plaintiffs incorporate by reference paragraphs 1 through 157 as if fully set forth herein.

159.   DeSoto, SES and SWN Energy received or retained money and/or the equivalent of money due and owing to Plaintiffs, to which they are not entitled.

26

**160.**     The existence and ongoing retention of these monies by DeSoto, SES, and SWN Energy effected an immediate and measurable increase in their cash, revenue, and profits and they have benefited from their wrongful acts and been unjustly enriched at the expense of Plaintiffs.

**161.**     DeSoto, SES, and SWN Energy's retention of such monies is unjust and unwarranted for all the reasons set forth herein.

**162.**     As a result of DeSoto, SES, and SWN Energy's unjust enrichment, Plaintiffs have been damaged.

**163.**     DeSoto, SES, and SWN Energy should not be allowed in equity and good conscience to retain their ill-gotten gains, but instead should be forced to disgorge what they wrongfully obtained from Plaintiffs.

**COUNT VII – VIOLATION OF A.C.A. §§ 15-74-601 THROUGH 604**
**(Against All Defendants)**

**164.**     Plaintiffs incorporate by reference paragraphs 1 through 163 as if fully set forth herein.

**165.**     SEECO violated A.C.A. §§ 15-74-601 through 604 by without just cause and/or through bad faith, willfully withholding payments due to Plaintiffs, who are legally entitled to the proceeds from the production from their Wells.

**166.**     Plaintiffs are entitled to all unpaid proceeds, interest, and penalties provided in A.C.A. §§ 15-74-601 through 604.

**COUNT VIII – TREBLE DAMAGES AND ATTORNEYS' FEES FOR**
**UNDERPAYMENT (A.C.A. § 15-74-708)**
**(Against DeSoto and SES)**

**167.**     Plaintiffs incorporate by reference paragraphs 1 through 166 as if fully set forth herein.

168.    Through contracts with DeSoto and SES, SEECO received from the sale of production from Plaintiffs' Wells more than their just, proportionate share therefrom.  As such, under A.C.A. § 15-74-708, DeSoto and SES must forfeit to Plaintiffs treble value of the amount of oil or gas wrongfully taken from Plaintiffs.

## COUNT IX – ALTER EGO THEORY FOR PIERCING CORPORATE VEIL
### (Against All Defendants)

169.    Plaintiffs incorporate by reference paragraphs 1 through 168 as if fully set forth herein.

170.    Plaintiffs seek to have a judicial determination that SEECO, DeSoto, SES, and SWN Energy are in fact the alter ego of one another.  Many of them have interlocking officers and directors.  Furthermore, upon information and belief, SEECO, DeSoto, and SES are directly or indirectly subsidiaries of SWN Energy.  Upon information and belief, one of the reasons for having multiple entities is to thwart discovery, shield liability, avoid legal obligations, and provide an additional layer of secrecy and complexity to deter Plaintiffs for obtaining full compensation.

171.    The result of holding that SEECO, DeSoto, SES, and SWN Energy are alter egos of one another and piercing their corporate veils is that the alleged inter-company sales and deductions would be disregarded and only arms-length sales to legitimate third parties would be considered valid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order and judgment against all Defendants and in favor of themselves, including the following relief:

a.  Money damages;

b. As a result of SEECO's actions, including its unjust enrichment, Plaintiffs pray that SEECO be required to disgorge all monies, consideration, and other value obtained by SEECO as a result of its violation of its obligations and duties to Plaintiffs, together with such profits, if any, SEECO has realized from its actions, including its unjust enrichment;

c. Punitive damages as a result of SEECO's malicious, wanton, willful, intentional, and reckless disregard for Plaintiffs' rights, in an amount sufficient to punish SEECO and to deter such conduct in the future, which amount shall be determined by the jury;

d. Statutory damages, interest, and/or penalties under Arkansas law, including A.C.A. §§ 15-74-601 through 604 and A.C.A. § 15-74-708;

e. An accounting, including an accounting showing the true value of the royalties that should have been paid to Plaintiffs;

f. Costs, including reasonable attorneys' fees and litigation and other expenses and fees, including experts' fees, as permitted by law;

g. Joint and several liability of the defendants SEECO, DeSoto, SES, and SWN Energy; and

h. Such other relief in law and equity, including, without limitation, costs incurred by Plaintiffs, pre-judgment and post-judgment interest pursuant to Arkansas law, and any other relief to which Plaintiffs show themselves to be entitled.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: September 23, 2015

Charles "Skip" Davidson, Bar No. 73026
Stephen Gershner, Bar No. 78059
Davidson Law Firm
7245 Garland, Cantrell at State
P.O. Box 1300
Little Rock, Arkansas 72203
Phone: (501) 374-9977
Fax: (501) 374-5917
Email: Skip.davidson@dlf-ar.com
Email: slg@dlf-ar.com

George A. Barton, Mo. Bar No. 26249
Law Offices of George A. Barton, P.C.
7227 Metcalf Ave., Ste. 301
Overland Park, KS 66204
Phone: (816) 300-6250
Fax: (816) 300-6259
Email: gab@georgebartonlaw.com

# EXHIBIT I

Prepared by and after recording please return to:
T. S. Dudley Land Company, Inc
5925 North Robinson Avenue
Oklahoma City OK, 73118-0000
TSDI LPR# 13-05017-4487

FORM NO. 1101

# OIL AND GAS LEASE
## (Paid-up Lease--No Delay Rentals)

THIS AGREEMENT, made and entered into this 3rd day of September, 2013 by and between **Jimmie D. Carson & E. Darlene Flagg now E. Darlene Flagg Carson, husband and wife wrs/jt, 135 Bluff View Drive, Quitman, AR 72131-0000** hereinafter called lessor (whether one or more), and **SEECO, Inc. , 2350 North Sam Houston Parkway Suite 125, Houston, TX 77032-0000** hereinafter called Lessee.

WITNESSETH Lessor, for and in consideration of __TEN AND MORE__ Dollars ($10.00) and other good and valuable consideration in hand paid, receipt of which is hereby acknowledged, and of the agreements of lessee hereinafter set forth, hereby grants, demises, leases and lets exclusively unto said lessee the lands hereinafter described for the purpose of prospecting, exploring by geophysical and other methods, drilling, mining, operating for and producing oil or gas, or both, including, but not as a limitation, casinghead gas, casinghead gasoline, gas condensate (distillate) and any substance, whether similar or dissimilar, produced in a gaseous state, together with the right to construct and maintain pipe lines, telephone and electric lines, tanks, power stations, ponds, roadways, plants, equipment, and structures thereon to produce, save and take care of said oil and gas, and the exclusive right to inject air, gas, water, brine and other fluids from any source into the subsurface strata and any and all other rights and privileges necessary, incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production, saving and taking care of oil and gas and the injection of air, gas, water, brine and other fluids into the subsurface strata, Said lands being situated in the County of Cleburne, State of Arkansas, and being described as follows to-wit:

**Section 10-10N-11W: Lot 29, Diamond Bluff Estate 1.1 acres, more or less.**

It being the purpose and intent of lessor to lease, and lessor does hereby lease, all of the lands or interests in lands owned by lessor which adjoin the lands above described or which lie in the section or sections herein specified whether or not herein completely and accurately described together with and including any accretions thereto which may have formed, may now be forming or may hereafter form. For all purposes of this lease, said lands shall be deemed to contain 1.1000000 acres.

Subject to the other provisions herein contained, this lease shall remain in force for a term of 3 Years from 09/03/2013 (herein called primary term) and as long thereafter as oil and gas, or either of them, is produced from the above described land or drilling operations are continuously prosecuted as hereafter provided. "Drilling operations" includes operations for the drilling of a new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-establish production of oil or gas, and drilling operations shall be considered to be "continuously prosecuted" if not more than 180 days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on another well or hole. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the above described land but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted, and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced. If, after the expiration of the primary term of this lease, production from the above described land should cease, this lease shall not terminate if lessee is then prosecuting drilling operations, or within 180 days after each such cessation of production commences drilling operations, and this lease shall remain in force so long as such operations are continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the above described land.

In consideration of the premises, lessee covenants and agrees:

1. To deliver, free of cost, to lessor at the wells, or to the credit of lessor in the pipeline to which the wells may be connected, the equal three-sixteenths (3/16) part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or, at lessee's option, to pay to lessor for such three-sixteenths (3/16) royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease.

2. Lessee shall pay Lessor three-sixteenths (3/16) of the proceeds derived from the sale of all gas (including substances contained in such gas) produced, saved, and sold by Lessee. Proceeds are defined as the actual amount received by the Lessee for the sale of said gas. In calculating the proceeds derived from the sale of gas produced, saved and sold by Lessee, Lessee shall be entitled to deduct all reasonable gathering, transportation, treatment, compression, processing and marketing costs that are incurred by Lessee in connection with the sale of such gas.

3. The consideration paid to lessor for this lease includes consideration in lieu of delay rental provisions and the rights and obligations of the parties hereunder shall be the same as if this lease contained provisions for the payment of periodic delay rentals throughout the primary term hereof and each such delay rental had been timely paid and accepted by lessor.

4. If a well capable of producing gas or gas and gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut in, as royalty, an amount equal to $1.00 per acre for the acreage covered by this lease as to which the leasehold rights are, at the end of such annual period, owned by the lessee making such payment, provided that, if lessor owns less than the full and entire royalty interest in such acreage, such payments shall be such part (calculated on a royalty-acre basis) of said amount as lessor's royalty interest bears to the full and entire royalty interest in such acreage, and provided further that, if gas or gas-condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this lease is being maintained in force and effect otherwise than by reason of such shut-in well, lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Such payment may be made or tendered to lessor or to lessor's credit in the <u>Pay Lessor Directly</u> at _____ _____ which bank and its successors shall continue as the depository regardless _____ of changes in the ownership of said land or the right to receive royalty hereunder. Royalty ownership as of the last day of each such annual period as shown by lessee's records shall govern the determination of the party or parties entitled to receive such payment.

5. If lessor owns a less interest in the land covered by this lease than the entire and undivided fee simple mineral estate therein, then whether or not such lessee interest is referred to or described herein, all royalties herein provided shall be paid lessor only in the proportion (calculated on a royalty-acre basis) which the royalty interest owned by him in said land bears to the full and entire royalty interest in said land.

6. If the estate of either party hereto is assigned or sublet, and the privilege of assigning or subletting in whole or in part is expressly allowed, the express and implied covenants hereof shall extend to the sublessees successors and assigns of the parties, and in the event of an assignment or subletting by lessee, lessee shall be relieved and discharged as to the leasehold rights so assigned or sublet from any liability to lessor thereafter accruing upon any of the covenants or conditions of this lease, either express or implied. No change in the ownership of the land or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of lessee or require separate measuring or installation of separate tanks by lessee. Notwithstanding any actual or constructive knowledge of or notice to lessee, no change in the ownership of said land or of the right to receive royalties hereunder, or of any interest therein, whether by reason of death, conveyance or any other matter, shall be binding on lessee (except at lessee's option in any particular case) until 90 days after lessee has been furnished written notice thereof, and the supporting information hereinafter referred to, by the party claiming as a result of such change in ownership or interest. Such notice shall be supported by original or certified copies of all documents and other instruments or proceedings necessary in lessee's opinion to establish the ownership of the claiming party.

7. Lessee may, at any time, execute and deliver to lessor or place of record a release covering all or any part of the acreage embraced in the leased premises or covering any one or more zones, formations or depths underlying all or any part of such acreage, and thereupon shall be relieved of all obligations thereafter to accrue with respect to the acreage, zones, formations or depths covered by such release.

8. Lessee is granted the right, from time to time while this lease is in force, to pool into a separate drilling or operating unit or units all or any part of the land covered by this lease with other land, lease or leases, or interests therein (whether such other interests are pooled by a voluntary agreement on the part of the owners therefore by the exercise of a right to pool by the lessees thereof), when in lessee's judgment it is necessary or advisable in order to promote conservation, to properly develop or operate the land and

interests to be pooled, or to obtain a multiple production allowable from any government agency having control over such matters. Moreover, if any governmental regulation or order shall permit or prescribe a spacing pattern for the development of a field wherein the above described land, or a portion thereof, is located, or allocate a producing allowable based on acreage per well, then any such unit may embrace such additional or lesser amount of acreage as may be so permitted or prescribed or as may be permitted in such allocation of allowable. In lieu of the royalties elsewhere herein specified, except shut-in gas well royalties, lessor shall receive on production from an area so pooled only such portion of the royalties which, in the absence of such pooling, would be payable hereunder to lessor on production from the land covered by this lease which is placed in the pooled area as the amount of the surface acreage in the land covered by this lease which is placed in the pooled area bears to the amount of the surface acreage of the entire pooled area. Nothing herein contained shall authorize or effect any transfer of any title to any leasehold, royalty or other interest pooled pursuant hereto. The commencement of a well, the conduct of other drilling operations, the completion of a well or of a dry hole, or the production of a producing well on the pooled area, shall be considered for all purposes (except for royalty purposes) the same as if said well were located upon, or such drilling operations were conducted upon the lands covered by this lease whether or not such well is located upon, or such drilling operations are conducted upon, said lands. Lessee may terminate any pooling effected pursuant hereto at any time the pooled unit is not producing and no drilling operations are being conducted thereupon by executing and filing of record in the county or counties in which the pooled area is located a written declaration of the termination of such pooling, provided that the pooling of all interests not covered by this lease which comprise a part of such pooled unit be also terminated in some effective manner.

9. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and remove all casing, but the Lessee shall be under no obligation to do so.

10. Lessor hereby warrants and agrees to defend the title to the lands herein described, but if the interest of lessor covered by this lease is expressly stated to be less than the entire fee or mineral estate, lessor's warranty shall be limited to the interest so stated. Lessee may purchase or lease the rights of any party claiming any interest in said land and exercise such rights as may be obtained thereby but lessee shall not suffer any forfeiture nor incur any liability to lessor by reason thereof. Lessee shall have the right at any time to pay for lessor, any mortgage, taxes or other lien on said lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder thereof, and any such payments made by lessee for lessor may be deducted from any amounts of money which may become due lessor under this lease.

11. In the event lessor considers that lessee is in breach of any of its obligations hereunder, lessor shall notify lessee in writing of the facts relied upon as constituting a breach hereof, and lessee, if in breach hereof, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this lease. Until such time as lessee has been given the above-described written notice and opportunity to cure the asserted breach, lessee shall not be considered in default under the terms of this lease.

12. Should lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, by operation of force majeure, by any Federal or state law or any order, rule or regulation of governmental authority, or by any other cause beyond the reasonable control of lessee, then while so prevented, lessees obligation to comply with such covenant shall be suspended, and lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises; and the time while lessee is so prevented shall not be counted against lessee, anything in this lease to the contrary notwithstanding.

13. This lease and all provisions thereof shall be applicable to, binding upon and enforceable by the parties thereto and their respective successors and assigns. Reference herein to lessor and lessee shall include reference to their respective successors and assigns, it being expressly agreed that lessor and lessee shall have the right to assign. Should any one or more of the parties named above as lessors not execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

14. Each wife/husband above named hereby joins in the execution and delivery of this lease for the purpose of conveying, releasing and relinquishing unto lessee, for the purpose and consideration aforesaid, all of his/her right, title, interest and estate in said land, including any rights of dower/curtesy and homestead which he/she may have therein.

IN WITNESS WHEREOF, this lease is executed as of the day and year first above written.

_____   _____
Jimmie D. Carson                      E. Darlene Flagg Carson


_____   _____


STATE OF _____

COUNTY OF _____


On this _____ day of _____ 20___ , before me the
undersigned Notary Public in and for said County and State personally appeared Jimmie D. Carson & E.
Darlene Flagg now E. Darlene Flagg Carson,  husband and wife was/if known to me to be the persons
whose names are subscribed to the foregoing  instrument  and acknowledged that they executed the
same as  their  free and voluntary act and  deed for the purpose and consideration therein mentioned and
set forth.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.


_____

Notary Public, State of _____

Printed Name: _____

Commission Expires:_____

Form No. 1102

## OIL AND GAS LEASE
(Paid-up Lease—No Delay Rentals)

THIS AGREEMENT, made and entered into this ___8th___ day of _____May_____, 2003, by and between
Charles Corbitt and Fern Corbitt, As Trustees of the Charles Corbitt and Fern Corbitt Revocable Trust Declaration Dated March
17, 1996

of   4 Art Pond Road, Conway, AR 72032                                          hereinafter called Lessor

(whether one or more) and MID-CONTINENT TITLE & LEASING CONSULTANTS, INC., P. O. Box 54558, Oklahoma City,
Oklahoma 73154, hereinafter called Lessee.

WITNESSETH: Lessor for and in consideration of Ten and no/100 Dollars ($10.00) and other good and valuable consideration in
hand paid, receipt of which is hereby acknowledged, and of the agreements of lessee hereinafter set forth, hereby grants, demises,
leases and lets exclusively unto said lessee the lands hereinafter described for the purpose of prospecting, exploring by geophysical
and other methods, drilling, mining, operating for and producing oil or gas, or both, including, but not as a limitation, casinghead gas,
casinghead gasoline, gas-condensate (distillate) and any substance, whether similar or dissimilar, produced in a gaseous state,
together with the right to construct and maintain pipe lines, telephone and electric lines, tanks, power stations, ponds, roadways,
plants, equipment and structures thereon to produce, save and take care of said oil and gas, and the exclusive right to inject air,
gas, water, brine and other fluids from any source into the subsurface strata and any and all other rights and privileges necessary,
incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production,
saving and taking care of oil and gas and the injection of air, gas, water, brine, and other fluids into the subsurface strata, said
lands being situated in the:

County of _____Cleburne_____, State of Arkansas, and being described as follows, to-wit:

_____
_____
_____SE/4 SE/4_____
_____
_____

of Section ___24___, Township ___10 North___, Range ___12 West___, it being the purpose and intent of lessor to lease, and
lessor does hereby lease, all of the lands or interests in lands owned by lessor which adjoin the lands described or which lie
in the section or sections herein specified whether or not herein completely and accurately described, together with and including
any accretions thereto which may have formed, may now be forming or may hereafter form. For all purposes of this lease, said
lands shall be deemed to contain ___40.00___ acres.

Subject to the other provisions herein contained, this lease shall remain in force for a term of ___TEN___ years from this date
(herein called "primary term") and as long thereafter as oil and gas, or either of them, is produced from the above described land or
drilling operations are continuously prosecuted as hereinafter provided. "Drilling Operations" includes operations for the drilling of a
new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-
establish production of oil or gas; and drilling operations shall be considered to be "continuously prosecuted" if not more than 180
days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on
another well or hole. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the above described
land but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are
continuously prosecuted; and if production of oil and gas results from any such drilling operations, this lease shall continue in force
so long as oil or gas shall be produced. If, after the expiration of the primary term of this lease, production from the above described
land should cease, this lease shall not terminate if lessee is then prosecuting drilling operations, or within 180 days after such
cessation of production commences drilling operations, and this lease shall remain in force so long as such operations are
continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the described
land.

In consideration of the premises, lessee covenants and agrees:

1. To deliver, free of cost, to lessor at the wells, or to the credit of lessor in the pipeline to which the wells may be connected, the
equal one-eighth (1/8) part of all and other liquid hydrocarbons produced and saved from the leased premises, or, at lessee's option,
to pay to lessor for such one-eighth (1/8) royalty the market price at the well for such oil and other liquid hydrocarbons of like grade
and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease.

2. Lessee shall pay Lessor one-eighth of the proceeds derived from the sale of all gas (including substances contained in such gas)
produced, saved, and sold by Lessee.  Proceeds are defined as the actual amount received by the Lessee for the sale of said gas.
In calculating the proceeds derived from the sale of gas produced, saved and sold by Lessee, Lessee shall be entitled to deduct all
reasonable gathering, transportation, treatment, compression, processing and marketing costs that are incurred by Lessee in
connection with the sale of such gas.

3.  The consideration paid to lessor for this lease includes consideration in lieu of delay rental provisions and the rights and
obligations of the parties hereunder shall be the same as if this lease contained provisions for the payment of periodic delay rentals
throughout the primary term hereof and each such delay rental had been timely paid and accepted by lessor.

4.  If a well capable of producing gas or gas-condensate is paying quantities located on the lease premises (or on acreage pooled or
consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and
no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products,
nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this
lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the
primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensate capable of being produced from such
shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in lessee's
judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender within 45 days after the
expiration of each period of one year's length (annual period) during which such well is so shut in, as royalty, an amount equal to
$1.00 per acre for the acreage covered by this lease as to which the leasehold rights are, at the end of such annual period, owned
by the lessee making such payment; provided that, if lessor owns less than the full and entire royalty interest in such acreage, such
payments shall be such part (calculated on a royalty-acre basis) of said amount as lessor's royalty interest bears to the full and
entire royalty interest in such acreage; and provided further that, if gas or gas-condensate from such well is sold or used as
aforesaid before the end of any such annual period, or if, at the end of any such annual period, this lease is being maintained in
force and effect otherwise than by reason of such shut-in well, lessee shall not be obligated to pay or tender, for that particular
annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Such payment may
be made or tendered to lessor or to lessor's credit in the _____ Bank at
_____ which Bank and its
successors shall continue as the depository regardless of changes in the ownership of said land or the right to receive royalty
hereunder. Royalty ownership as of the last day of each such annual period as shown by lessee's records shall govern the
determination of the party or parties entitled to receive such payment.

Form No. 1102

STATE OF ARKANSAS }
COUNTY OF Cleburne } §

(Individual or Joint Acknowledgment—Arkansas)

On this 8 day of May, 2003, before me the undersigned Notary Public in and for said County and State personally appeared Charles Corbitt and Fern Corbitt, As Trustees of the Charles Corbitt and Fern Corbitt Revocable Trust Declaration Dated March 17, 1998 known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged that they executed the same as their free and voluntary act and deed for the purposes and consideration therein mentioned and set forth. IN WITNESS WHEREOF I have hereunto set my hand and official seal.

My Commission Expires:

4-26-2011

Notary Public

OFFICIAL SEAL
HEATHER SMITH
NOTARY PUBLIC - ARKANSAS
CLEBURNE COUNTY
MY COMMISSION EXPIRES 4-26-2011

STATE OF _____ }
COUNTY OF _____ } §

(Individual or Joint Acknowledgment—Arkansas)

On this _____ day of _____, 2003, before me the undersigned Notary Public in and for said County and State personally appeared _____ known to me to be the person whose name _____ subscribed to the foregoing instrument and acknowledged that _____ executed the same as _____ free and voluntary act and deed for the purposes and consideration therein mentioned and set forth. IN WITNESS WHEREOF I have hereunto set my hand and official seal.

My Commission Expires:

_____

Notary Public

STATE OF _____ }
COUNTY OF _____ } §

(Corporate Acknowledgment—Arkansas)

Before me, the undersigned, a Notary Public in and for said County and State on this _____ day of 2003, personally appeared _____ to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as its and acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of such corporation, for the uses and purposes therein set forth.

Given my hand and seal the day and year last above written.

My Commission Expires:

_____

Notary Public

CERTIFICATE OF RECORD
STATE OF ARKANSAS COUNTY OF CLEBURNE
I, KAREN GILES, Clerk of the Circuit Court and Ex-Officio Recorder do hereby certify that this instrument was FILED FOR RECORD and is RECORDED on this DATE DEC 17 2003 8:40 and TIME __ on and in BOOK OL-2B PAGE 395-397
KAREN GILES, clerk
_____ D.C.

KAREN GILES
CIRCUIT CLERK
CLEBURNE COUNTY
HEBER SPRINGS, ARKANSAS
03 DEC 17 AM 8:40



FORM NO. 1102



# OIL AND GAS LEASE
### (Paid-up Lease--No Delay Rentals)

THIS AGREEMENT, made and entered into this _____21st_____ day of ___October___ 20 _04_ by and between

### H.R. Johnson and Avanelle Johnson, husband and wife

of 1839 Highway 285, Damascus, AR 72039                                                                   hereinafter called lessor (whether one or more),
and New Century Production Company, LLC, P.O. Box 22754, Oklahoma City, OK 73123                          hereinafter called Lessee.

WITNESSETH Lessor, for and in consideration of ___TEN AND MORE___ Dollars ($10.00) and other good and valuable consideration in hand paid, receipt of which is hereby acknowledged, and of the agreements of lessee hereinafter set forth, hereby grants, demises, leases and lets exclusively unto said lessee the lands hereinafter described for the purpose of prospecting, exploring by geophysical and other methods, drilling, mining, operating for and producing oil or gas, or both, including, but not as a limitation, casinghead gas, casinghead gasoline, gas condensate (distillate) and any substance, whether similar or dissimilar, produced in a gaseous state, together with the right to construct and maintain pipe lines, telephone and electric lines, tanks, power stations, ponds, roadways, plants, equipment, and structures thereon to produce, save and take care of said oil and gas, and the exclusive right to inject air, gas, water, brine and other fluids from any source into the subsurface strata and any and all other rights and privileges necessary, incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production, saving and taking care of oil and gas and the injection of air, gas, water, brine and other fluids into the subsurface strata, said lands being situated in the County of Van Buren , State of Arkansas, and being described as follows, to-wit:

TOWNSHIP 9 NORTH, RANGE 14 WEST

SECTION 36:

The West half of the Northwest Quarter (W/2 NW/4)

of Section ___36___ , Township ___9N___ , Range ___14W___ , it being the purpose and intent of lessor to lease, and lessor does hereby lease, all of the lands or interests in lands owned by lessor which adjoin the lands above described or which lie in the section or sections herein specified whether or not herein completely and accurately described together with and including any accretions thereto which may have formed, may now be forming or may hereafter form. For all purposes of this lease, said lands shall be deemed to contain ___80___ acres.

Subject to the other provisions herein contained, this lease shall remain in force for a term of ___5___ years from this date (herein called "primary term") and as long thereafter as oil and gas, or either of them, is produced from the above described land or drilling operations are continuously prosecuted as hereafter provided. "Drilling operations" includes operations for the drilling of a new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-establish production of oil or gas, and drilling operations shall be considered to be "continuously prosecuted" if not more than 180 days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on another well or hole. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the above described land but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted, and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced. If, after the expiration of the primary term of this lease, production from the above described land should cease, this lease shall not terminate if lessee is then prosecuting drilling operations, or within 180 days after each such cessation of production commences drilling operations, and this lease shall remain in force so long as such operations are continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the above described land.

In consideration of the premises, lessee covenants and agrees:

1. To deliver, free of cost, to lessor at the wells, or to the credit of lessor in the pipeline to which the wells may be connected, the equal one-eighth (1/8) part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or, at lessee's option, to pay to lessor for such one-eighth (1/8) royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease.

2. Lessee shall pay Lessor one-eighth (1/8) of the proceeds derived from the sale of all gas (including substances contained in such gas) produced, saved, and sold by Lessee. Proceeds are defined as the actual amount received by the Lessee for the sale of said gas. In calculating the proceeds derived from the sale of gas produced, saved and sold by Lessee, Lessee shall be entitled to deduct all reasonable gathering, transportation, treatment, compression, processing and marketing costs that are incurred by Lessee in connection with the sale of such gas.

3. The consideration paid to lessor for this lease includes consideration in lieu of delay rental provisions and the rights and obligations of the parties hereunder shall be the same as if this lease contained provisions for the payment of periodic delay rentals throughout the primary term hereof and each such delay rental had been timely paid and accepted by lessor.

04- 11475

4. If a well capable of producing gas or gas and gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut in, as royalty, an amount equal to $1.00 per acre for the acreage covered by this lease as to which the leasehold rights are, at the end of such annual period, owned by the lessee making such payment, provided that, if lessor owns less than the full and entire royalty interest in such acreage, such payments shall be such part (calculated on a royalty-acre basis) of said amount as lessor's royalty interest bears to the full and entire royalty interest in such acreage, and provided further that, if gas or gas-condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this lease is being maintained in force and effect otherwise than by reason of such shut-in well, lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Such payment may be made or tendered to lessor or to lessor's credit in the _____ Bank at _____ which bank and its successors shall continue as the depository regardless of changes in the ownership of said land or the right to receive royalty hereunder. Royalty ownership as of the last day of each such annual period as shown by lessee's records shall govern the determination of the party or parties entitled to receive such payment.

5.   If lessor owns a less interest in the land covered by this lease than the entire and undivided fee simple mineral estate therein, then whether or not such less interest is referred to or described herein, all royalties herein provided shall be paid lessor only in the proportion (calculated on a royalty-acre basis) which the royalty interest owned by him in said land bears to the full and entire royalty interest in said land.

6. If the estate of either party hereto is assigned or sublet, and the privilege of assigning or subletting in whole or in part is expressly allowed, the express and implied covenants hereof shall extend to the sublessees successors and assigns of the parties, and in the event of an assignment or subletting by lessee, lessee shall be relieved and discharged as to the leasehold rights so assigned or sublet from any liability to lessor thereafter accruing upon any of the covenants or conditions of this lease, either express or implied. No change in the ownership of the land or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of lessee or require separate measuring or installation of separate tanks by lessee. Notwithstanding any actual or constructive knowledge of or notice to lessee, no change in the ownership of said land or of the right to receive royalties hereunder, or of any interest therein, whether by reason of death, conveyance or any other matter, shall be binding on lessee (except at lessee's option in any particular case) until 90 days after lessee has been furnished written notice thereof, and the supporting information hereinafter referred to, by the party claiming as a result of such change in ownership or interest. Such notice shall be supported by original or certified copies of all documents and other instruments or proceedings necessary in lessee's opinion to establish the ownership of the claiming party.

7. Lessee may, at any time, execute and deliver to lessor or place of record a release covering all or any part of the acreage embraced in the leased premises or covering any one or more zones, formations or depths underlying all or any part of such acreage, and thereupon shall be relieved of all obligations thereafter to accrue with respect to the acreage, zones, formations or depths covered by such release.

8. Lessee is granted the right, from time to time while this lease is in force, to pool into a separate drilling or operating unit or units all or any part of the land covered by this lease with other land, lease or leases, or interests therein (whether such other interests are pooled by a voluntary agreement on the part of the owners therefor by the exercise of a right to pool by the lessees thereof), when in lessee's judgment it is necessary or advisable in order to promote conservation, to properly develop or operate the land and interests to be pooled, or to obtain a multiple production allowable from any government agency having control over such matters. Moreover, if any governmental regulation or order shall permit or prescribe a spacing pattern for the development of a field wherein the above described land, or a portion thereof, is located, or allocate a producing allowable based on acreage per well, then any such unit may embrace such additional or lesser amount of acreage as may be so permitted or prescribed or as may be permitted in such allocation of allowable. In lieu of the royalties elsewhere herein specified, except shut-in gas well royalties, lessor shall receive on production from an area so pooled only such portion of the royalties which, in the absence of such pooling, would be payable hereunder to lessor on production from the land covered by this lease which is placed in the pooled area as the amount of the surface acreage in the land covered by this lease which is placed in the pooled area bears to the amount of the surface acreage of the entire pooled area. Nothing herein contained shall authorize or effect any transfer of any title to any leasehold, royalty or other interest pooled pursuant hereto. The commencement of a well, the conduct of other drilling operations, the completion of a well or of a dry hole, or the operation of a producing well on the pooled area, shall be considered for all purposes (except for royalty purposes) the same as if said well were located upon, or such drilling operations were conducted upon the lands covered by this lease whether or not such well is located upon, or such drilling operations are conducted upon, said lands. Lessee may terminate any pooling effected pursuant hereto at any time the pooled unit is not producing and no drilling operations are being conducted thereupon by executing and filing of record in the county or counties in which the pooled area is located a written declaration of the termination of such pooling, provided that the pooling of all interests not covered by this lease which comprise a part of such pooled unit be also terminated in some effective manner.

9. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and remove all casing, but the Lessee shall be under no obligation to do so.

10. Lessor hereby warrants and agrees to defend the title to the lands herein described, but if the interest of lessor covered by this lease is expressly stated to be less than the entire fee or mineral estate, lessor's warranty shall be limited to the interest so stated. Lessee may purchase or lease the rights of any party claiming any interest in said land and exercise such rights as may be obtained thereby but lessee shall not suffer any forfeiture nor incur any liability to lessor by reason thereof. Lessee shall have the right at any time to pay for lessor, any mortgage, taxes or other lien on said lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder thereof, and any such payments made by lessee for lessor may be deducted from any amounts of money which may become due lessor under this lease.

11. In the event lessor considers that lessee is in breach of any of its obligations hereunder, lessor shall notify lessee in writing of the facts relied upon as constituting a breach hereof, and lessee, if in breach hereof, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this lease. Until such time as lessee has been given the above-described written notice and opportunity to cure the asserted breach, lessee shall not be considered in default under the terms of this lease.

12. Should lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, by operation of force majeure, by any Federal or state law or any order, rule or regulation of governmental authority, or by any other cause beyond the reasonable control of lessee, then while so prevented, lessee's obligation to comply with such covenant shall be suspended, and lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises; and the time while lessee is so prevented shall not be counted against lessee, anything in this lease to the contrary notwithstanding.

13. This lease and all provisions thereof shall be applicable to, binding upon and enforceable by the parties thereto and their respective successors and assigns. Reference herein to lessor and lessee shall include reference to their respective successors and assigns, it being expressly agreed that lessor and lessee shall have the right to assign. Should any one or more of the parties named above as lessors not execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

14 Each wife/husband above named hereby joins in the execution and delivery of this lease for the purpose of conveying, releasing and relinquishing unto lessee, for the purpose and consideration aforesaid, all of his/her right, title, interest and estate in said land, including any rights of dower/curtesy and homestead which he/she may have therein.

15. Lessee is hereby given the exclusive option and right to extend the primary term of this lease as to all or any part of the above-described lands for an additional _____ five _____ ( 5 ) years, commencing with the expiration of the original primary term described above. This option may be exercised by Lessee at any time during the original primary term by paying to Lessor the sum of $___ 50.00 ___ per net mineral acre for each net mineral acre hereunder that is being extended by lessee and is not otherwise being maintained by other provisions hereof. Payment may be made by check or draft mailed, tendered or delivered to lessor at any time during the primary term hereof. If, at the time this payment is made, multiple parties are entitled to specific amounts according to Lessee's records, such payment may be divided between said parties and paid in the same proportions.

IN WITNESS WHEREOF, this lease is executed as of the day and year first above written.

_____

_____                    _____
H. R. Johnson                                                Avanelle Johnson

_____                    _____

**(Individual or Joint Acknowledgement - Arkansas)**

STATE OF   Arkansas _____   §
                                               §
COUNTY OF _____    §

       On this _____ day of _____ 20__ 04 __ before me the undersigned Notary Public in
and for said County and State personally appeared   H.R. Johnson and Avanelle Johnson, husband and wife

_____

known to me to be the person S _____ whose name  S _____ subscribed to the foregoing instrument and acknowledged
that  they _____ executed the same as  their _____ free and voluntary act and deed for the purpose and consideration therein mentioned
and set forth. IN WITNESS WHEREOF I have hereunto set my hand and official seal.

My Commission Expires: _____    _____
                                                     Notary Public

FORM NO. 1102



## OIL AND GAS LEASE
### (Paid-up Lease--No Delay Rentals)

THIS AGREEMENT, made and entered into this _____ 21st _____ day of _____ October _____ 20 __ 04 __ by and between

**H.R. Johnson and Avanelle Johnson, husband and wife, and  Jack K. Johnson, a single man**

of 1839 Highway 285, Damascus, AR 72039 _____ hereinafter called lessor (whether one or more),
and New Century Production Company, LLC, P.O. Box 22754, Oklahoma City, OK 73123 _____ hereinafter called Lessee.

WITNESSETH Lessor, for and in consideration of _____ TEN AND MORE _____ Dollars ($10.00) and other good and valuable consideration in hand paid, receipt of which is hereby acknowledged, and of the agreements of lessee hereinafter set forth, hereby grants, demises, leases and lets exclusively unto said lessee the lands hereinafter described for the purpose of prospecting, exploring by geophysical and other methods, drilling, mining, operating for and producing oil or gas, or both, including, but not as a limitation, casinghead gas, casinghead gasoline, gas condensate (distillate) and any substance, whether similar or dissimilar, produced in a gaseous state, together with the right to construct and maintain pipe lines, telephone and electric lines, tanks, power stations, ponds, roadways, plants, equipment, and structures thereon to produce, save and take care of said oil and gas, and the exclusive right to inject air, gas, water, brine and other fluids from any source into the subsurface strata and any and all other rights and privileges necessary, incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production, saving and taking care of oil and gas and the injection of air, gas, water, brine and other fluids into the subsurface strata, said lands being situated in the County of _____ Van Buren _____ , State of Arkansas, and being described as follows, to-wit:

### SEE ATTACHED EXHIBIT "A"

of Section _____ 16 _____ , Township _____ 9 _____ , Range _____ 13 _____ , it being the purpose and intent of lessor to lease, and lessor does hereby lease, all of the lands or interests in lands owned by lessor which adjoin the lands above described or which lie in the section or sections herein specified whether or not herein completely and accurately described together with and including any accretions thereto which may have formed, may now be forming or may hereafter form. For all purposes of this lease, said lands shall be deemed to contain _____ 200 _____ acres.

Subject to the other provisions herein contained, this lease shall remain in force for a term of _____ 5 _____ years from this date (herein called "primary term") and as long thereafter as oil and gas, or either of them, is produced from the above described land or drilling operations are continuously prosecuted as hereafter provided. "Drilling operations" includes operations for the drilling of a new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-establish production of oil or gas, and drilling operations shall be considered to be "continuously prosecuted" if not more than 180 days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on another well or hole. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the above described land but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted, and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced. If, after the expiration of the primary term of this lease, production from the above described land should cease, this lease shall not terminate if lessee is then prosecuting drilling operations, or within 180 days after each such cessation of production commences drilling operations, and this lease shall remain in force so long as such drilling operations are continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the above described land.

In consideration of the premises, lessee covenants and agrees:

1. To deliver, free of cost, to lessor at the wells, or to the credit of lessor in the pipeline to which the wells may be connected, the equal one-eighth (1/8) part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or, at lessee's option, to pay to lessor for such one-eighth (1/8) royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease.

2. Lessee shall pay Lessor one-eighth of the proceeds derived from the sale of all gas (including substances contained in such gas) produced, saved, and sold by Lessee. Proceeds are defined as the actual amount received by the Lessee for the sale of said gas. In calculating the proceeds derived from the sale of gas produced, saved and sold by Lessee, Lessee shall be entitled to deduct all reasonable gathering, transportation, treatment, compression, processing and marketing costs that are incurred by Lessee in connection with the sale of such gas.

3. The consideration paid to lessor for this lease includes consideration in lieu of delay rental provisions and the rights and obligations of the parties hereunder shall be the same as if this lease contained provisions for the payment of periodic delay rentals throughout the primary term hereof and each such delay rental had been timely paid and accepted by lessor.

04-11474

4. If a well capable of producing gas or gas and gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this lease will continue in force during all of the time or times while said well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut in, as royalty, an amount equal to $1.00 per acre for the acreage covered by this lease as to which the leasehold rights are, at the end of such annual period, owned by the lessee making such payment, provided that, if lessor owns less than the full mineral or royalty interest in such acreage, such payments shall be such part (calculated on a royalty-acre basis) of said amount as lessor's royalty interest bears to the full and entire royalty interest in such acreage, and provided further that, if gas or gas-condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this lease is being maintained in force and effect otherwise than by reason of such shut-in well, lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Such payment may be made or tendered to lessor or to lessor's credit in the _____ Bank at _____ which bank and its successors shall continue as the depository regardless of changes in the ownership of said land or the right to receive royalty hereunder. Royalty ownership as of the last day of each such annual period as shown by lessee's records shall govern the determination of the party or parties entitled to receive such payment.

5. If lessor owns a less interest in the land covered by this lease than the entire and undivided fee simple mineral estate therein, then whether or not such less interest is referred to or described herein, all royalties herein provided shall be paid lessor only in the proportion (calculated on a royalty-acre basis) which the royalty interest owned by him in said land bears to the full and entire royalty interest in said land.

6. If the estate of either party hereto is assigned or sublet, and the privilege of assigning or subletting in whole or in part is expressly allowed, the express and implied covenants hereof shall extend to the sublessees successors and assigns of the parties, and in the event of an assignment or subletting by lessee, lessee shall be relieved and discharged as to the leasehold rights so assigned or sublet from any liability to lessor thereafter accruing upon any of the covenants or conditions of this lease, either express or implied. No change in the ownership of the land or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of lessee or require separate measuring or installation of separate tanks by lessee. Notwithstanding any actual or constructive knowledge of or notice to lessee, no change in the ownership of said land or of the right to receive royalties hereunder, or of any interest therein, whether by reason of death, conveyance or any other matter, shall be binding on lessee (except at lessee's option in any particular case) until 90 days after lessee has been furnished written notice thereof, and the supporting information hereinafter referred to, by the party claiming as a result of such change in ownership or interest. Such notice shall be supported by original or certified copies of all documents and other instruments or proceedings necessary in lessee's opinion to establish the ownership of the claiming party.

7. Lessee may, at any time, execute and deliver to lessor or place of record a release covering all or any part of the acreage embraced in the leased premises or covering any one or more zones, formations or depths underlying all or any part of such acreage, and thereupon shall be relieved of all obligations thereafter to accrue with respect to the acreage, zones, formations or depths covered by such release.

8. Lessee is granted the right, from time to time while this lease is in force, to pool into a separate drilling or operating unit or units all or any part of the land covered by this lease with other land, lease or leases, or interests therein (whether such other interests are pooled by a voluntary agreement on the part of the owners therefor by the exercise of a right to pool by the lessees thereof), when in lessee's judgment it is necessary or advisable in order to promote conservation, to properly develop or operate the land and interests to be pooled, or to obtain a multiple production allowable from any government agency having control over such matters. Moreover, if any governmental regulation or order shall permit or prescribe a spacing pattern for the development of a field wherein the above described land, or a portion thereof, is located, or allocate a producing allowable based on acreage per well, then any such unit may embrace such additional or lesser amount of acreage as may be so permitted or prescribed or as may be permitted in such allocation of allowable. In lieu of the royalties elsewhere herein specified, except shut-in gas well royalties, lessor shall receive on production from an area so pooled only such portion of the royalties which, in the absence of such pooling, would be payable hereunder to lessor on production from the land covered by this lease which is placed in the pooled area as the amount of the surface acreage in the land covered by this lease which is placed in the pooled area bears to the amount of the surface acreage of the entire pooled area. Nothing herein contained shall authorize or effect any transfer of any title to any leasehold, royalty or other interest pooled pursuant hereto. The commencement of a well, the conduct of other drilling operations, the completion of a well or of a dry hole, or the operation of a producing well on the pooled area, shall be considered for all purposes (except for royalty purposes) the same as if said well were located upon, or such drilling operations were conducted upon the lands covered by this lease whether or not such well is located upon, or such drilling operations are conducted upon, said lands. Lessee may terminate any pooling effected pursuant hereto at any time the pooled unit is not producing and no drilling operations are being conducted thereupon by executing and filing of record in the county or counties in which the pooled area is located a written declaration of the termination of such pooling, provided that the pooling of all interests not covered by this lease which comprise a part of such pooled unit be also terminated in some effective manner.

9. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and remove all casing, but the Lessee shall be under no obligation to do so.

10. Lessor hereby warrants and agrees to defend the title to the lands herein described, but if the interest of lessor covered by this lease is expressly stated to be less than the entire fee or mineral estate, lessor's warranty shall be limited to the interest so stated. Lessee may purchase or lease the rights of any party claiming any interest in said land and exercise such rights as may be obtained thereby but lessee shall not suffer any forfeiture nor incur any liability to lessor by reason thereof. Lessee shall have the right at any time to pay for lessor, any mortgage, taxes or other lien on said lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder thereof, and any such payments made by lessee for lessor may be deducted from any amounts of money which may become due lessor under this lease.

11. In the event lessor considers that lessee is in breach of any of its obligations hereunder, lessor shall notify lessee in writing of the facts relied upon as constituting a breach hereof, and lessee, if in breach hereof, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this lease. Until such time as lessee has been given the above-described written notice and opportunity to cure the asserted breach, lessee shall not be considered in default under the terms of this lease.

12. Should lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, by operation of force majeure, by any Federal or state law or any order, rule or regulation of governmental authority, or by any other cause beyond the reasonable control of lessee, then while so prevented, lessee's obligation to comply with such covenant shall be suspended, and lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises, and the time while lessee is so prevented shall not be counted against lessee, anything in this lease to the contrary notwithstanding.

13. This lease and all provisions thereof shall be applicable to, binding upon and enforceable by the parties thereto and their respective successors and assigns. Reference herein to lessor and lessee shall include reference to their respective successors and assigns, it being expressly agreed that lessor and lessee shall have the right to assign. Should any one or more of the parties named above as lessors not execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

14 Each wife/husband above named hereby joins in the execution and delivery of this lease for the purpose of conveying, releasing and relinquishing unto lessee, for the purpose and consideration aforesaid, all of his/her right, title, interest and estate in said land, including any rights of dower/courtesy and homestead which he/she may have therein.

15. Lessee is hereby given the exclusive option and right to extend the primary term of this lease as to all or any part of the above-described lands for an additional _____ five _____ ( 5 ) years, commencing with the expiration of the original primary term described above. This option may be exercised by Lessee at any time during the original primary term by paying to Lessor the sum of $ __50.00__ per net mineral acre for each net mineral acre hereunder that is being extended by lessee and is not otherwise being maintained by other provisions hereof. Payment may be made by check or draft mailed, tendered or delivered to lessor at any time during the primary term hereof. If, at the time this payment is made, multiple parties are entitled to specific amounts according to Lessee's records, such payment may be divided between said parties and paid in the same proportions.

IN WITNESS WHEREOF, this lease is executed as of the day and year first above written.

_____

_____                    _____
H. R. Johnson                                              Jack K. Johnson


Avanelle Johnson
                                                           **(Individual or Joint Acknowledgement - Arkansas)**

STATE OF   Arkansas_____   §
                                            §
COUNTY OF _____           §

On this _____ day of _____ 20 _04_ before me the undersigned Notary Public in and for said County and State personally appeared  H.R. Johnson and Avanelle Johnson, husband and wife _____

known to me to be the person S _____ whose name  S _____ subscribed to the foregoing instrument and acknowledged that  they _____ executed the same as  their _____ free and voluntary act and deed for the purpose and consideration therein mentioned and set forth. IN WITNESS WHEREOF I have hereunto set my hand and official seal.

My Commission Expires: _____        _____
                                                               Notary Public



**(Individual or Joint Acknowledgement – Arkansas)**

STATE OF Arkansas _____ §
§
COUNTY OF _____ §

On this _____ day of _____ 20 04 before me the undersigned Notary Public in and for said County and State personally appeared _____ Jack K. Johnson, a single man _____

known to me to be the person _____ whose name _____ subscribed to the foregoing instrument and acknowledged that __he_____ executed the same as __his_____ free and voluntary act and deed for the purpose and consideration therein mentioned and set forth. IN WITNESS WHEREOF I have hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires: _____

**(Individual or Joint Acknowledgement – Arkansas)**

STATE OF _____ §
§
COUNTY OF _____ §

On this _____ day of _____ 20____ before me the undersigned Notary Public in and for said County and State personally appeared _____

known to me to be the person _____ whose name _____ subscribed to the foregoing instrument and acknowledged that _____ executed the same as _____ free and voluntary act and deed for the purpose and consideration therein mentioned and set forth. IN WITNESS WHEREOF I have hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires: _____

# EXHIBIT "A"



This Exhibit "A" is attached to and made a part of that certain Oil and Gas Lease dated the 21st day of    October, 2004 by and between H.R. Johnson and Avanelle Johnson, husband and wife, and retaining a life estate, and Jack K. Johnson, a single man

as Lessor and New Century Production Company, LLC as Lessee.

16.     With regard to drilling activity, access roads, well sites, pipelines and/or surface facilities to be constructed on the leased premises under the terms of this lease such surface activities shall be done in consultation with the Lessor and Lessee agrees to notify Lessor prior to commencement of any surface activity on the leased premises in order to begin negotiations for a surface use agreement. Lessee agrees to use reasonable care in its operations on the leased premises and shall proceed with reasonable diligence to restore the surface of the leased premises to as near its original condition as reasonably practicable within a reasonable period of time after the completion of any operation on the leased premises. Lessee agrees to be responsible for all damages resulting from Lessee's operations hereunder to growing crops, livestock, timber, surface, buildings, water wells, personal property and surface improvements on the leased premises

TOWNSHIP 09 NORTH, RANGE 13 WEST

SECTION 16:

NW/4 SW/4; E/2 SW/4; SW/4 SE/4; W/2 SE/4 SE/4; E/2 SW/4 SW/4
Out of the NW/4 SW/4 part, the surface only belongs to the Arkansas State Highway Commission, it being:
Starting at the SW/c NW/4 SW/4 thence run South 88deg 15min East 40.00 feet to the point of beginning; thence North 02dge 06min East 1343.1 feet; thence South 88deg 14min East 10 feet; thence South 02deg 06min West 832.2 feet; thence South 00deg 11min 27sec West 300.2 feet; thence South 02deg 06min West 210.9 feet; thence North 88deg 15min West 20 feet to the point of beginning, 0.39 acres, more or less, and starting at the SW/c NE/4 SE/4 of 17-9N-13W thence run South 89deg 28min 43sec East 408.536 meters; thence South 89deg 20min 18sec East 18.29 meters for the point of beginning; thence North 01deg 14min 33sec East 69.927 meters; thence North 00deg 50min 53sec West 91.235 meters; thence North 01deg 08min 51sec East 151.741 meters; thence North 01deg 09min 53sec East 101.613 meters; thence South 88deg 57min 53sec East 6.017 meters; thence South 01deg 14min 59sec West 31.688 meters; thence South 06deg 20min 37sec East 60.531 meters; thence South 06deg 57min 42sec West 60.299 meters; thence South 01deg 15min 04sec West 262.753 meters; thence North 89deg 20min 18sec West 4.504 meters to the point of beginning, 0.31 hectare (0.76601 acres), more or less.

Initialed for identification _____



**EXHIBIT II**

Statement of Oil & Gas Payments

Page 1 of 2

SEECO, INC.
ATTN: REVENUE ACCOUNTING
2350 N SAM HOUSTON PKWY E
HOUSTON TX 77032-0000
(866) 372-2001

BRENDA KAY HOLLEY

Royalty Account

| Owner No. | Check No. | Check Date | Net Amount |
|---|---|---|---|
| 302996 | 1102196 | 04/25/2011 | $164.07 |

| Prod mo/yr | Product | Prod/ Interest Type | BTU Factor | Share | Lease Interest | Settlement Interest | Volume MCF/BBL | State/County Price $ | Value $ | Severance | Taxes Code | Production | Code | Comp/ CDPE | Deductions GL | Gathering TT | MKG | Other | Code | Net Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**20431G001A / GREEN BAY PKG 10-11 #1-21H ............. ARKANSAS / CLEBURNE**

| 06-09 | GAS | ROY. INT | | Gross | | | | | | | | | | | | | | | -0.01 | PP | -0.01 |
| 06-09 | | 06-09 | | Owner | 0.00098748 | 0.00098748 | | | | | | | | | | | | -0.01 | | -0.01 |

Owner Subtotal for Period 06-09 ..... | | | | | | | | | | | | -0.01 | -0.01

| 12-10 | GAS | ROY. INT | | Gross | | | | | | | | | | | | | | | 42.16 |
| 12-10 | | 12-10 | | Owner | 0.00098748 | 0.00098748 | 123.92 | 3.15 | 389.84 | 5.64 | SV | 82.16 | VT | | | | | -0.07 | | 42.16 |

Owner Subtotal for Period 12-10 ..... | | | | | | 123.92 | | 389.84 | 5.64 | | 82.16 | | | | | -0.07 | 42.16

| 01-11 | GAS | ROY. INT | 13-10 | Gross | | | 0.12 | | 0.39 | 0.01 | SV | 0.07 | VT | | | | | | | -0.20 |
| 01-11 | GAS | XTO | | Owner | 0.00098748 | 0.00098748 | 347.28 | 3.06 | 1,183.04 | 21.20 | SV | 0.07 | VT | | | | | | | 382.88 |
| 01-11 | GAS | CHK | | Owner | 0.00098748 | 0.00098748 | 0.39 | | 1.17 | 0.02 | SV | 1.12 | VT | | | | | | | 0.33 |
| 01-11 | GAS | BP | | Owner | 0.00098748 | 0.00098748 | 606.96 | 4.30 | 2,918.88 | 29.52 | SV | | | | | | | | | | 1,181.84 |
| 01-11 | GAS | ROY. INT | | Owner | 0.00098748 | 0.00098748 | 0.60 | | 2.58 | 0.03 | SV | | | | | | | | | | 1.15 |

Owner Subtotal for Period 01-11 ..... | | | | | | | | | | | | | | | | | | 1,939.20

**206380001A / JACKSON 10-11 #3-16H21 ............. ARKANSAS / CLEBURNE**

| 01-11 | GAS | ROY. INT | 09-11 | Gross | | | 1.11 | 3.84 | 4.14 | 0.04 | SV | 0.05 | VT | | | | | | | -4.98 |
| 01-11 | | 01-11 | | Owner | 0.00098748 | 0.00098748 | | | | | | 0.06 | VT | | | | | 0.64 | | -4.98 |

Owner Subtotal for Period 01-11 ..... | | | | | | 1.11 | | 4.14 | 0.04 | | 0.06 | | | | | 0.64 | -4.98

| 02-11 | GAS | ROY. INT | 02-11 | Gross | | | 6,520.90 | 3.84 | 25,026.93 | 299.53 | HP | 64.96 | VT | 787.36 | 521.85 | 314.75 | | 0.84 | | 18,658.40 |
| 02-11 | | 02-11 | | Owner | 0.00098748 | 0.00098748 | 6.44 | | 24.71 | 0.29 | HP | 0.06 | VT | 0.78 | 0.52 | | | | | 18.73 |

Owner Subtotal for Period 02-11 ..... | | | | | | 6.44 | | 24.71 | 0.29 | | 0.06 | | 0.78 | 0.52 | 0.00 | | 0.84 | 18.73

Owner Total Net for Property: | | | | | | 7.55 | | 28.85 | 0.35 | | 0.13 | | 0.76 | 0.52 | 0.00 | | 0.63 | 23.05

| 01-11 | GAS | ROY. INT | 13-10 | Gross | | | 455.92 | 3.09 | 1,407.94 | 21.12 | SV | 207.36 | VT | | | | | -0.01 | TR | -0.01 |
| 01-11 | GAS | XTO | 13-10 | Owner | 0.00094304 | 0.00094304 | 0.43 | | 1.32 | 0.02 | SV | 0.20 | VT | | | | | 0.01 | | -0.01 |
| 01-11 | GAS | CHK | | Owner | 0.00094304 | 0.00094304 | 1,438.80 | 2.95 | 4,242.08 | 21.20 | SV | 4.08 | VT | | | | | | | -207.36 |
| 01-11 | GAS | KCS | | Owner | 0.00094304 | 0.00094304 | 1.35 | | 4.00 | 0.07 | SV | | | | | | | | | | -0.20 |
| 01-11 | GAS | ROY. INT | | Owner | 0.00094304 | 0.00094304 | 30.96 | 3.93 | 121.76 | 1.52 | SV | | | | | | | | | | 3.93 |
| 01-11 | GAS | ROY. INT | | Owner | 0.00094304 | 0.00094304 | 0.03 | | 0.12 | | SV | | | | | | | | | | 100.40 |

Owner Subtotal for Period 01-11 ..... | | | | | | | | | | | | | | | | | | 1,352.54

| 01-11 | GAS | ROY. INT | 01-11 | Gross | | | | | | | | 201.35 | VT | | | | | | | -207.36 |
| 01-11 | GAS | SEE | | Owner | 0.00094304 | 0.00094304 | 1.81 | 3.82 | 8.44 | 0.09 | HC | 0.19 | VT | 2,500.42 | 1,655.02 | 994.60 | | 0.01 | | 5.16 |
| 02-11 | GAS | ROY. INT | | Owner | 0.00094304 | 0.00094304 | 20,666.50 | | 79,090.62 | 944.50 | HC | | | 2.38 | 1.56 | 0.00 | | 0.01 | | 59.44 |
| 02-11 | GAS | 02-11 | | Owner | 0.00094304 | 0.00094304 | 19.51 | | 74.50 | 0.89 | HC | | | 10.34 | | | | | | 59.44 |

Owner Subtotal for Period 02-11 ..... | | | | | | 19.51 | | 74.50 | 0.89 | | | | 2.38 | 1.56 | 0.00 | | 0.01 | 59.44

Owner Total Net for Property: | | | | | | 20.03 | | 80.03 | 0.96 | | 0.39 | | 2.38 | 1.56 | 0.00 | | 0.01 | 64.37

| 06-09 | GAS | ROY. INT | | Gross | | | 0.00097030 | 0.00097030 | | | | | SV | | | | | | | | -0.01 |
| 06-09 | | | | Owner | 0.00097030 | 0.00097030 | | | | 0.01 | SV | | | | | | | | | -0.01 |

Statement of Oil & Gas Payments

BRENDA KAY HOLLEY

Royalty Account

| Owner No. | Check No. | Check Date | Net Amount |
|---|---|---|---|
| 302996 | 1102196 | 04/25/2011 | $164.07 |

Page 2 of 2

SEECO, INC.
ATTN: REVENUE ACCOUNTING
2350 N SAM HOUSTON PKWY E
HOUSTON TX 77032-0000
(866) 372-0901

| Property Number / Property Name | | | | | | State / County | | | | | | | | | | Taxes | | | | | | Deductions | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prod Period | Prod Product | Prod Interest Type | BTU Factor | Share | Lease/ Interest | Settlement Interest | Volume MCF/BBL | Price $ | Value $ | Severance | Code | Production | Code | Compression | CCOM | Gathering | GA | Treating/ Trucking TT | Marketing MK | Other | Code | Net Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**206852001A / JACKSON 10-11 #4-16H21**     ARKANSAS / CLEBURNE

| 12-10 | GAS | ROY INT | | | Owner | 0.00097030 | | | | 0.01 | | | | | | | | | | | | -0.01 |
| 12-10 | GAS | ROY INT | 18×10 | | Owner | | | | | | | | 206.08 | VT | | | | | | | | -208.08 |
| | | Owner Subtotal for Period | 18×10 | | | | | | | | | | | 206.08 | | | | | | | | | -208.08 |
| 01-11 | GAS | XTO | | | Gross | 0.00097030 | 429.92 | 3.13 | 1,343.36 | 20.16 | SV | | 0.20 | VT | | | | | | | | | -0.20 |
| 01-11 | GAS | ROY INT | | | Owner | 0.00097030 | 0.42 | | 1.31 | 0.02 | SV | | | | | | | | | | | | -1.313.36 |
| 01-11 | GAS | CHK | | | Gross | 0.00097030 | 1,354.40 | | 4,004.84 | 72.02 | SV | | 3.84 | VT | | | | | | | | | 1.29 |
| 01-11 | GAS | ROY INT | | | Owner | 0.00097030 | 1.31 | 2.98 | 3.84 | 0.07 | SV | | | | | | | | | | | | 3,901.82 |
| 01-11 | GAS | CHK | | | Gross | 0.00097030 | 441.04 | 4.33 | 1,894.24 | 22.48 | SV | | | | | | | | | | | | 3.84 |
| 01-11 | GAS | ROY INT | | | Owner | 0.00097030 | 0.45 | | 1.94 | 0.02 | SV | | | | | 19.84 | | | 32.24 | | | | 1,839.52 |
| 01-11 | GAS | KCS | | | Gross | 0.00097030 | 30.88 | 3.94 | 121.68 | 1.52 | SV | | | | | | | | 0.03 | | | | 1.89 |
| 01-11 | GAS | ROY INT | | | Owner | 0.00097030 | 0.03 | | 0.12 | | | | 0.02 | | | 0.02 | | | | | | | 100.32 |
| 01-11 | | ROY INT | | | Owner | | | | | | | | 204.08 | VT | | | | | | | | | 0.10 |
| | | Owner Subtotal for Period | 01-11 | | | | 2.21 | | 7.29 | 0.11 | | | 0.18 | | 0.02 | | | | | | | | -204.08 |
| 02-11 | GAS | SEE | | | Gross | 0.00097030 | 20,860.70 | 3.85 | 80,506.05 | 960.85 | HC | | | | | 0.02 | | 2,561.35 | 11,071.61 | 1,870.46 | | 0.03 | -0.19 |
| 02-11 | GAS | ROY INT | | | Owner | 0.00097030 | 20.27 | | 78.11 | 0.53 | HC | | 0.18 | VT | | | | 2.49 | 10.74 | 1.82 | | | 8.93 |
| 02-11 | | ROY INT | | | Owner | 0.00097030 | 20.27 | | 78.11 | 0.93 | | | | | | | | 2.49 | 10.74 | 1.82 | | | 63,227.37 |
| | | Owner Subtotal for Period | 02-11 | | | | 20.27 | | 78.11 | | | | | | | | | 2.49 | 10.74 | 1.82 | | 0.00 | 62.33 |
| | | Owner Total Net for Property: | | | | | 22.48 | | 84.39 | 1.05 | | | 0.35 | | 0.03 | | | 2.49 | 10.76 | 1.82 | | 0.03 | 62.33 |

**206879001A / GREEN BAY PKG 10-11 #2-21**     ARKANSAS / CLEBURNE

| 05-09 | GAS | BP | | | Gross | 0.00098748 | | | | | | | | | | | | | | | | -0.01 |
| 06-09 | | ROY INT | | | Owner | 0.00098748 | | | -0.02 | -0.01 | SV | | -0.01 | VT | | | | | | | | | -0.01 |
| | | Owner Subtotal for Period | 06-09 | | | | | | -0.02 | -0.01 | | | -0.01 | | | | | | | | | | -26.96 |
| 12-10 | GAS | XTO | | | Gross | 0.00098748 | | 3.91 | | | | | | | | | | | | | | | -0.03 |
| 12-10 | | ROY INT | | | Owner | 0.00098748 | | | | | | | | | | | | | | | | | 199.36 |
| | | Owner Subtotal for Period | 12-10 | | | | | | | | | | | | | | | | | | | | 0.20 |
| 01-11 | GAS | XTO | | | Gross | 0.00098748 | 62.96 | 3.22 | 202.96 | 3.04 | SV | | 0.03 | VT | | | | | | | | | 492.48 |
| 01-11 | | ROY INT | | | Owner | 0.00098748 | 0.06 | | 0.20 | | | | 0.03 | VT | | | | | | | | | 0.48 |
| 01-11 | GAS | CHK | | | Gross | 0.00098748 | 146.86 | 3.20 | 501.36 | 8.58 | SV | | 0.59 | VT | | | | | | | | | 213.20 |
| 01-11 | | ROY INT | | | Owner | 0.00098748 | 0.15 | | 0.50 | 0.01 | SV | | | | | | | | | | | | | 0.22 |
| 01-11 | GAS | BP | | | Gross | 0.00098748 | 62.96 | 4.46 | 281.04 | 3.28 | SV | | | | | | | | 64.55 | | | | -25.80 |
| 01-11 | | ROY INT | | | Owner | 0.00098748 | 0.06 | | 0.28 | | | | | | | | | | 0.06 | | | | -0.03 |
| 02-11 | | | | | Owner | | | | | | | | 25.80 | VT | | | | | | | | | -1.03 |
| 02-11 | | ROY INT | | | Owner | | | | 0.81 | 0.01 | NO | | 0.03 | VT | | 294.43 | | 1,120.12 | | 104.90 | | 0.06 | 6,736.13 |
| 02-11 | | SEE | | | Gross | | | 3.91 | 8,333.70 | 102.62 | NO | | 0.18 | VT | | 0.26 | 1.11 | | | | | | 6.75 |
| 02-11 | | ROY INT | | | Owner | 0.00098748 | 8.23 | | 8.23 | 0.10 | NO | | 0.03 | | | 0.26 | 1.11 | | | 0.00 | | | 6.76 |
| | | Owner Subtotal for Period | 02-11 | | | | 8.23 | | 8.23 | 0.18 | | | 0.03 | | | 0.26 | 1.11 | | | | | | 6.76 |
| | | Owner Total Net for Property: | | | | | 2.57 | | 8.19 | 0.10 | | | 0.06 | | | 0.26 | 1.11 | 1.82 | | 0.06 | | 0.03 | 7.60 |

(continued)